STATE

v.

**Brian MLYNIEC.**

No. 2009–47–C.A.

Supreme Court of Rhode Island.

March 7, 2011.

984

Lauren S. Zurier, Department of Attorney General, for State.

Paula Rosin, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The defendant, Brian Mlyniec, appeals from a Superior Court judgment of conviction for first-degree murder, for which he

received a sentence of life imprisonment without the possibility of parole. On appeal, the defendant argues that the trial justice erred in (1) failing to suppress the defendant's videotaped statement to the police; (2) admitting testimony about a prior act of misconduct by the defendant; (3) refusing to recuse himself; and (4) imposing a sentence of life without the possibility of parole. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

On December 11, 2006, defendant was charged with the murder of Kelly Anderson,[1] in violation of G.L.1956 § 11–23–1.[2] The state also filed notice that it would be seeking a sentence of life without parole under § 11–23–2(4),[3] alleging the murder involved an aggravated battery or torture.

Before trial, defendant filed a motion to recuse after the trial justice made comments about a past interaction with defense counsel. A hearing was held on May 22, 2008, and the trial justice subsequently denied the motion to recuse.

Pretrial motions, including defendant's motion to suppress statements given to the West Warwick police, were heard on June 19 and 20, 2008. The defendant ultimately challenged only the admission of a statement he gave to the police on June 26, 2006, arguing that the statement was not voluntary because of his intoxication, sleeplessness, and state of depression.[4] The trial justice denied the motion to suppress, explaining that although defendant may have been under the effects of prescription drugs and alcohol, he was not so impaired as to render his statements involuntary.

The defendant then was tried in Superior Court before a jury during June and July 2008. The pertinent evidence ad-

1. Although her last name appears as "Andersen" throughout the transcripts, we use "Anderson" as it is spelled in the indictment, lower court motions and orders, and defendant's letters.

2. General Laws 1956 § 11–23–1 states, in pertinent part:
 "The unlawful killing of a human being with malice aforethought is murder. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any arson or any violation of §§ 11–4–2, 11–4–3, or 11–4–4, rape, any degree of sexual assault or child molestation, burglary or breaking and entering, robbery, kidnapping, or committed during the course of the perpetration, or attempted perpetration, of felony manufacture, sale, delivery, or other distribution of a controlled substance otherwise prohibited by the provisions of chapter 28 of title 21, or while resisting arrest by, or under arrest of, any state trooper or police officer in the

performance of his or her duty or committed against an assistant attorney general or special assistant attorney general in the performance of his or her duty, or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him or her who is killed, is murder in the first degree."

3. Section 11–23–2 states, in pertinent part:
 "Every person guilty of murder in the first degree shall be imprisoned for life. Every person guilty of murder in the first degree: * * * (4) committed in a manner involving torture or an aggravated battery to the victim; * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 that person shall not be eligible for parole from imprisonment."

4. Initially, defendant also moved to suppress a statement given to the police during an interview on June 23, but he indicated at the hearing that he did not wish to press that issue any longer.

duced at trial, surrounding Ms. Anderson's death, is set forth below.

The defendant testified that he met Ms. Anderson in March 2006 while working to remove rugs from a rug company where Ms. Anderson worked and kept her belongings. Because the company was closing and Ms. Anderson had no immediate place to live, defendant offered to store her belongings in a shed at his house. According to defendant, he also offered Ms. Anderson a spare room in exchange for her agreement to do "some cleaning" in the house. As a result, Ms. Anderson moved in with defendant for about a week and a half. The defendant also testified that during this period they engaged in sexual activities and that Ms. Anderson introduced him to asphyxiaphilia, which he described as the use of a belt or scarf "to tie the throat of another person [to] reduce their oxygen supply to the brain, which increases the person's orgasm."

On June 22, 2006, defendant said, he engaged in a "normal routine" after work, cashing his paycheck and purchasing Gatorade, vodka, brandy, and cigarettes.[5] The defendant then received a ride to Kennedy Plaza, where he noticed Ms. Anderson getting off a bus around 6 p.m. The defendant testified that she looked thinner and appeared to stagger and that he was concerned she had relapsed.[6] He further claimed that she asked to move back in with him, and he agreed.

According to defendant, after he and Ms. Anderson missed a bus, they sat and drank vodka with Gatorade and went behind a dumpster and "fooled around." A later bus then brought them to a stop in West Warwick, from where they walked to defendant's house. The defendant testified that Ms. Anderson was "tipsy" and that she talked about sex during the whole walk. The defendant carried her bags that he said contained scarves, clothes, and a Walkman.

After the couple reached his house, around 9 p.m., defendant put his dog outside and returned inside to find Ms. Anderson sitting on the couch naked. The defendant testified that he made vodka drinks and then he and Ms. Anderson engaged in oral sexual activities.

The defendant testified that afterwards, because he could not achieve an erection, Ms. Anderson asked if he wanted to tie her up, and he agreed. The defendant testified that he could not find anything with which to tie her so he tried to use her Walkman earbuds,[7] but they broke off immediately. The defendant then used a television cable. The defendant testified that Ms. Anderson actually tried to tie the cable to her ankles herself, which he completed, and that he then tied her wrists. The defendant said he also tried to "hogtie" her. According to defendant, Ms. Anderson was tied up only "[m]omentarily" because the cable came off.

The defendant testified that later in the evening, Ms. Anderson grabbed a belt from her bag for "the asphyxiation thing that she wanted to do." The defendant then described a series of vigorous sexual activities during which on several occasions Ms. Anderson would say "pull the

---

**5.** The defendant testified that he used alcohol "very severely," that he had been hospitalized for alcoholism on many occasions, and that he would call himself an alcoholic.

**6.** Ms. Anderson was a recovering heroin addict, and received methadone every day.

**7.** "Earbuds" are a style of headphones that consist of a wire with a round piece at the end, which goes into the listener's ear.

belt," which was around her neck,[8] as he penetrated her vaginally and anally with his hand. The defendant testified that he complied with her requests, stating that "[s]he'd say let go or I just knew enough to not hold it longer than about twenty seconds."

According to defendant, the sexual activities ended when Ms. Anderson lay back on the couch and was "really groggy." The defendant said he asked her whether he should call 911, and she replied that she did not want him to. The defendant testified that Ms. Anderson then walked with him to the bathroom, where he put her in a bathtub filled with cold water and sprayed water in her mouth, in an effort to wake her up. The defendant then poured coffee grinds down her throat. While Ms. Anderson was in the bathtub, at 12:53 a.m., defendant called his friend Bill Healey and spoke with him for approximately twenty minutes. The defendant told Mr. Healey that he needed help because a girl he had picked up was not responsive and was "coming in and out" of consciousness. Mr. Healey suggested that defendant call 911. The defendant called Mr. Healey a second time at 1:19 a.m., for seven minutes, and told him that "she was okay." Mr. Healey testified that although the conversation was "a little bizarre" he had no difficulty understanding defendant.

The defendant testified that Ms. Anderson then stood and leaned against a wall but fell, hitting her head on the bathroom tile as well as the toilet. The defen-dant said that, when he picked her up, she slipped out of his hands and fell under the sink. The defendant testified that after be picked her up again, she hit her head on the sink.[9]

The defendant testified that Ms. Anderson then walked with him from the bathroom to the living room. According to defendant, Ms. Anderson put her shirt on and pulled her pants to her ankles, and he then pulled her pants up the rest of the way. The defendant laid Ms. Anderson down on couch cushions on the floor; he said that she then went to sleep. According to defendant, while he was making another drink in the kitchen, he noticed blood on his hands, which prompted him to go wipe Ms. Anderson's vagina and anus, where he also saw blood.[10] The defendant said that he "pump[ed]" Ms. Anderson while she was drowsy, and she moaned.

Around 5:30 a.m. on June 23, defendant's neighbor, Michael Rothermel, saw defendant coming out of his driveway with blood on his face and arm. The defendant told Mr. Rothermel that he had picked up a girl who "had her period" and was out of it, so he had carried her to the shower. The defendant indicated that he was not going to work because he was worried she would rob him.

Around 7:15 that morning, defendant came in contact with another neighbor, Mark Townsend. They spoke for five to eight minutes, and defendant appeared "[n]ormal, sober" to Mr. Townsend.[11] The

8. During police interviews, defendant asserted that the belt was initially used around the victim's mouth and that it was not until later that it fell to a position around her neck.

9. The defendant later testified that "she fell under the sink[,] and as I lifted her up, she hit the back of her head on the bathtub—I mean on the toilet, I'm sorry, and off to the side is the dispenser, and she may have hit herself on the dispenser."

10. The defendant said during cross-examination, however, that these events occurred before he put Ms. Anderson into the bathtub.

11. Mr. Townsend testified that he knew defendant to be a drinker and that defendant was intoxicated "a good 75 percent of the time."

defendant told Mr. Townsend that he had brought home "that girl" last night; he said they drank and she "passed out, fell down, and he was kind of concerned about her condition."

The defendant also went to Jerry's Market twice that morning, once between 8 a.m. and 9 a.m., and a second time, around 11:30 a.m. The defendant bought cigarettes and food, including ribs, chicken, and ice cream sandwiches. Although he testified that Ms. Anderson was "sleeping" at the time, defendant put an ice cream sandwich in her mouth and continued to push it in, believing she ate it.

Around 11:15 a.m., defendant received a call from Labor Ready, offering work at Builders' Surplus. The defendant said that Ms. Anderson was asleep when he left. Jason Young, a Builders' Surplus worker, recalled that when defendant arrived around noon, it "seemed like something was bothering him"; he looked "really nervous," and he was "pacing," "shaky," and "really quiet." When Mr. Young asked whether everything was all right, defendant responded that he thought his ex-girlfriend was on methadone, and he asked Mr. Young about overdosing. Mr. Young testified that he suggested defendant call 911 and go home, but that defendant was more concerned about losing his job. The defendant eventually did leave work, around 1 p.m.

The defendant testified that when he arrived home, Ms. Anderson was discolored. The defendant said he began CPR and then left to ask a neighbor to call 911; when he returned to perform more CPR, he said he felt her grab him and he yelled that she was alive. The West Warwick police, fire, and rescue soon arrived. Eric Galloway, a firefighter/emergency medical technician for West Warwick, arrived around 1:30 p.m. Sergeant Scott Thornton of the West Warwick Police Department also responded. Upon entering, Mr. Galloway and Sgt. Thornton observed that the dwelling was "ransacked" and in "disarray," with various items of furniture, clothing, garbage, food, and overturned plants, strewn throughout the dwelling. They also observed an unresponsive adult female lying on her back, on couch cushions, in the middle of the living room floor; defendant was kneeling over her saying "she's moving."

Mr. Galloway approached the woman and found that "[s]he was obviously deceased at that time." The woman had visible bruising from her neck up; there was blood on her face, on the pillows around her, and matted in her hair; she displayed mottling of the skin, signs of rigor mortis and lividity, and she was cold to the touch. Lifesaving methods were not commenced, and death was determined. The police found a birth certificate and pill bottles that identified the deceased as Ms. Anderson.

Detective George Winman, of the West Warwick Police Department, arrived on scene at 1:47 p.m. and was assigned as lead detective. He observed that the bathroom was very dirty and the bathtub was partially filled with "brownish-colored water" and a submerged shirt. A medical examiner arrived at 3:08 p.m. Upon turning the deceased onto her side, substantial blood was observed in her mouth and nasal area and on the pillows beneath her. The body was then removed from the residence.

Officer Anthony Bettencourt, a patrolman in the West Warwick Police Department, also had arrived around 1:30 p.m. The defendant followed Officer Bettencourt to his police cruiser and sat in the back of it, uncuffed, facing out, with the door open and his feet on the ground. Detective Winman questioned defendant there for fifteen to twenty minutes. When

Det. Winman asked defendant whether he and Ms. Anderson had engaged in sex, he replied no. The defendant told the detective that he became concerned for Ms. Anderson's well-being around 3 a.m., describing her as being "out of it" and having her eyes rolled back. Officer Bettencourt also asked defendant whether he had engaged in sex with Ms. Anderson, and defendant again replied no. The defendant later admitted, however, that they had had oral sex, and he explained his earlier denials by stating that he did not want people to think of Ms. Anderson as a tramp.

The defendant was taken to police headquarters. Sergeant Keith Azverde informed defendant that he was not under arrest, but Sgt. Azverde explained that they wanted to conduct a videotaped interview; defendant agreed to this and signed a departmental constitutional-rights form.[12] As a result of the interview, Detective Raymond Lemoi, who still was at defendant's house, was directed to look for a woman's belt, television cable wires, and earbuds. Detective Lemoi found a woman's silver belt, a black cable wire, and earbuds on the living room floor around where the victim had been found. Sharon Mallard, a Rhode Island Department of Health employee trained in DNA analysis, testified that the belt had visible red-brown stains on it, which she determined to be blood from multiple individuals, one being Ms. Anderson.

Peter Andrew Gillespie, M.D., an assistant medical examiner for the State of Rhode Island, conducted an autopsy on Ms. Anderson on June 24, 2006. During the examination, Dr. Gillespie discovered the following: a laceration on Ms. Anderson's forehead with bruising adjacent to it, bruises about her eyes and nose, swollen left eyelids, small petechial hemorrhages on the right side of her face, abrasions on her nose, abrasions between her nose and mouth, an abraded left lower lip, slight abrasions on her chin, blood coming from her mouth, multiple purple contusions and lacerations on the inside of her mouth, a contusion on the left jaw line, an abrasion on her shoulder, two series of five parallel scratch marks on her left and right inner breasts, a bruised right nipple, two pinkish-colored contusions on her left abdomen, two traumatic injuries on her small bowel corresponding with the contusions on her abdomen, two bruises on her left upper leg, small dry abrasions and bruising on both knees, a large bruise on the outside of her right knee, multiple bruises and abrasions on her left lower leg, a hand-like impression just above her left ankle, contusions on her right lower leg and ankle, an "O" shaped contusion on her right calf, small abrasions near her left and right ankles, abrasions and contusions on the outside of her foot, a large scratch mark on the upper right side of the back, additional scratch marks near her right shoulder, abrasions on the midline of her back, a small purple contusion on her lower back, a small yellow abrasion near her buttocks, and a large contusion on the back of her left elbow.

Doctor Gillespie explained that these were acute injuries, inflicted shortly before Ms. Anderson died, with the exception of the yellow abrasion on her back, which was a postmortem injury. Doctor Gillespie testified that the marks around the ankles appeared to be ligature or restraint impressions. He also believed that the bruising on the right calf and right nipple were suggestive of bite marks, and that the scratches on Ms. Anderson's breasts were caused by fingernails. Other abrasions and contusions were determined to be con-

---

12. The videotaped interview of defendant on June 23, as redacted in accord with the trial court's rulings, was played for the jury at trial.

tact injuries. Doctor Gillespie noted that it would have taken a fairly large object or a large amount of force to produce some of the larger bruises.

Doctor Gillespie further testified that he discovered "multiple traumatic injuries," on the top, the back, and both sides of Ms. Anderson's head, consisting of extensive bruising and areas of hemorrhage. Doctor Gillespie said that these injuries could have been caused by multiple falls, but not by a single fall, and he explained that their placement suggested that falling was not the actual cause.

Doctor Gillespie also examined the vagina, anus, and perineum. Near the anus there was a large purple-colored contusion and a large and small laceration; on the perineum there was a laceration approximately one-inch in length; and on the vagina there were multiple lacerations, some one-half inch in length. These injuries would have required surgical repair. Doctor Gillespie explained that it was unlikely that fingers could have caused these injuries, but he noted that a fist could have.

Finally, Dr. Gillespie examined Ms. Anderson's neck. An exterior examination revealed two contusions and faint parallel linear impressions on the neck. An internal examination revealed multiple areas of hemorrhage within multiple muscles of the neck, and a fractured hyoid bone. Doctor Gillespie testified that these injuries were caused by strangulation, and he stated that Ms. Anderson had died from strangulation. He explained that causing such strangulation took a large amount of force, likely somewhere between four and eleven pounds of pressure, applied for at least three to four minutes. Doctor Gillespie

estimated that Ms. Anderson had died between midnight and 3 a.m.

Toxicological findings from Ms. Anderson's blood revealed a large amount of methadone (4.22 micrograms per milliliter of blood),[13] an elevated level of citalopram (anti-depressant) (.91 micrograms per milliliter of blood), a large amount of drinking alcohol (.308 blood alcohol level), and a small amount of diphenhydramine (Benadryl) (.1 micrograms per milliliter of blood). Doctor Gillespie stated that the interaction of these substances would have made Ms. Anderson appear intoxicated and could have rendered her unconscious.

Doctor Gillespie testified that the high level of methadone and other substances, although potentially lethal, is "definitely not what killed [Ms. Anderson]." This opinion was based, in part, on his observation of the fractured hyoid bone, neck hemorrhages, and sclera hemorrhages of the eye, indicating that she was "definitely strangled"; it was also based on the lack of any indicators that are usually present with an overdose.

Doctor Gillespie did not find any coffee grinds in Ms. Anderson's stomach, but he did find foreign material in her mouth that may have been coffee grinds. Doctor Gillespie also determined that Ms. Anderson was not experiencing her period when she died, and he found no evidence that CPR was performed.

When questioned at trial about the injuries referred to above, defendant testified that he never struck Ms. Anderson with any object. He believed that her facial injuries were caused by the belt around her mouth. He said that the other bruises on her face and head must have been from falls "because [he] never hit her in the face whatsoever."[14] The defendant said that

---

13. Doctor Gillespie explained that although Ms. Anderson's methadone level was high and

she probably took more than her therapeutic dose, it was not necessarily toxic.

14. The defendant previously admitted during

the bruises on her legs also were from falls. He denied ever biting her. He said that the scratch marks were a result of Ms. Anderson's asking him to scratch her. Finally, defendant testified that the injuries to Ms. Anderson's vagina and anus were from her own actions of "riding" his hand.

After the medical examiner's report became available on June 26, 2006, Det. Winman completed an arrest warrant for defendant; he arrived at defendant's home at approximately 4:30 p.m., while defendant was outside with his neighbor. The detective informed defendant that he had more questions, and defendant agreed to return to police headquarters. The defendant testified that before the police arrived, he had ingested Klonopin and had been drinking vodka, but Det. Winman did not detect any factors indicating that defendant was under the influence of drugs or alcohol.

The defendant was taken to headquarters, where his entire interview, including his waiver of rights, was videotaped.[15] The defendant moved midtrial to suppress this statement on the additional ground that he had requested an attorney and questioning should have ceased. The motion was denied, however, as both untimely and meritless. Detective Winman testified that, after the interview, as defendant was being placed in the cell block, he said that he had submerged Ms. Anderson under

water,[16] looking for bubbles, and that he saw none.

Evidence also was presented that related to the past sexual practices of both defendant and Ms. Anderson.

After a motion *in limine* and a voir dire examination, the trial justice allowed testimony from one Melissa Audet concerning a sexual encounter with defendant that resulted in defendant's conviction for second-degree sexual assault.[17] The trial justice described her testimony as "like a lighthouse, lighting up the intellect to appreciate what, perhaps, went on here."[18] He found five grounds sufficient to allow the testimony: (1) to prove a plan to take advantage of Ms. Anderson; (2) to show intent; (3) to refute the argument of an accidental death; (4) to prove defendant's knowledge about what occurred; and (5) to show preparation. The trial justice concluded that the testimony would not cause undue delay, be cumulative, or waste time. He believed that although it was potentially prejudicial it was not unduly or unfairly prejudicial. He directed the state to avoid referring to defendant's drug or alcohol use, and he explained that a limiting instruction to the jury would prevent the jury from being misled.

Ms. Audet testified that she went out with defendant on February 16, 2001, after knowing him for a little over a week. After having drinks and smoking marijuana

---

interviews that he had slapped Ms. Anderson in the face a few times in an attempt to wake her.

15. A redacted version of the June 26 videotaped interview was also shown to the jury at trial.

16. The autopsy revealed liquid in Ms. Anderson's sphenoid sinus, confirming that her mouth and nose had been underwater at some point either when she was alive or dead.

17. The state also presented a person who could testify to having been victimized in a

similar manner in 1992 in East Providence, but the trial justice ruled evidence of this incident inadmissible because of its remoteness and potential to be cumulative.

18. The trial justice explained that "the cases are parallel. The victim is high on drugs. The victim is forced or plied with alcohol. The victim is, in the Audet case, given more drugs, and then equally parallel, they are bound and gagged; the parallel, it seems to me, to be an undeniable habit."

at a friend's house, defendant and Ms. Audet got a room at the Kingston Hotel. On the way to the hotel, Ms. Audet took a pill that defendant gave her, which he said was Valium. At the hotel, Ms. Audet drank more, smoked additional marijuana, and used crack cocaine. They kissed, and she allowed defendant to take a picture of her with her clothes off. Ms. Audet consented to sexual activity, but they did not have intercourse because defendant could not get an erection. Ms. Audet proceeded to take a shower and get dressed. Ms. Audet and defendant then engaged in horseplay, trading punches until he hit her too hard, at which point they stopped. The defendant had Ms. Audet state into a tape recorder what had happened, explaining that he did not want anyone to think he was a "woman beater." Soon thereafter, defendant used his mouth to put pills into Ms. Audet's mouth, and he held her mouth shut until she swallowed them. The defendant also spit vodka into her mouth.

The next thing Ms. Audet remembers is waking up to a pain in her anal area and finding her hands tied with a shoestring. Ms. Audet asked defendant to untie her. When she awoke a second time, her ankles were also tied together. The defendant said he had gotten stool on his finger, and he went to wash his hands. After this, Ms. Audet was "in and out of consciousness, feeling pains here and there"; she did scream, which led defendant to stuff a towel in her mouth and hold a pillow over her head.

When Ms. Audet awoke in the morning, defendant made her wait before untying her. Once untied, she noticed that her whole face was swollen. The defendant eventually brought her home and he told her aunt that she had fallen down while drunk. Upon leaving, defendant told Ms. Audet that he would return later to go look for an apartment and do her laundry. After showering, Ms. Audet got into bed and did not go anywhere for the rest of that day or the next day because she "could barely move." Finally, on February 19, after being encouraged by others, Ms. Audet called the police and sought medical treatment.

There was also testimony from Michael McDonald and Steven Alan Osier, concerning sexual interactions with Ms. Anderson. Mr. McDonald testified that during a sexual encounter six months before Ms. Anderson died, she requested that he put his fist in her vagina. Mr. Osier testified [19] that when he was intimate with Ms. Anderson in 2005 she put a belt around her neck and asked to have sex while he pulled on it. Both witnesses testified that Ms. Anderson did not ask them to tie her up or hit her.

On July 3, 2008, the jury returned a verdict of guilty of murder in the first degree, and it subsequently found that the murder involved an aggravated battery. The trial justice denied defendant's motion for a new trial, and on September 4, 2008, the trial justice sentenced defendant to life without parole. The defendant filed a

19. Mr. Osier and defendant met and discussed Ms. Anderson on a day that they were both scheduled for court appearances. There was testimony that defendant told Mr. Osier that he would take care of him if Mr. Osier helped him, but defendant denied any such arrangement. The next day, Mr. Osier called his son's mother from the Adult Correctional Institutions and told her that he would send her a letter that was "going to end all the money problems," and that it was "over a four digit number"; he also instructed her to rip up the letter after receiving it. Mr. Osier said that he was going to help somebody beat a murder case and that he was waiting for that man's lawyer to come speak to him. Mr. Osier testified, however, that he did not actually receive any money.

timely notice of appeal. Additional facts will be supplied as needed.

We will address the issues raised on appeal *seriatim.*

## II

## Discussion

### A

### Motion to Suppress Defendant's June 26 Statement

The defendant contends that the trial justice erred in denying his motion to suppress the statement he made to police on June 26, 2006, arguing (1) that the police's exploitation of his intoxicated state rendered his *Miranda* waiver, and thus his statement, involuntary and (2) that the police unlawfully ignored his request for counsel.

#### 1. Standard of Review

■ "When deciding a motion to suppress, a trial justice can admit a confession or a statement against a defendant only 'if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in *Miranda v. Arizona.*'" *State v. Bido,* 941 A.2d 822, 835 (R.I.2008) (quoting *State v. Dumas,* 750 A.2d 420, 423 (R.I.2000)).

■ In reviewing a trial justice's decision on a motion to suppress a statement that is alleged to be involuntary, this Court employs a two-step analysis. *Bido,* 941 A.2d at 835. "The first step is to 'review the trial justice's findings regarding the historical facts relevant to the voluntariness of the challenged confession.'" *State v. Perez,* 882 A.2d 574, 588 (R.I.2005) (quoting *State v. Humphrey,* 715 A.2d 1265, 1273 (R.I.1998)). It is well established that "[t]he findings of historical fact

by the trial justice are given great weight and will not be set aside [by this Court] unless they are clearly wrong." *Perez,* 882 A.2d at 588 (quoting *State v. Bailey,* 677 A.2d 407, 410 (R.I.1996)). "The second step of the analysis, assuming we accept the trial justice's findings of historical fact, requires this Court to apply those historical facts and review *de novo* the trial justice's determination of the voluntariness of the statement." *Bido,* 941 A.2d at 836. "Before we will reverse a trial court's ruling on a motion to suppress, our independent review of the conclusions of the trial court that are drawn from the historical facts must establish that the defendant's constitutional rights were denied." *Perez,* 882 A.2d at 588 (citing *State v. Grayhurst,* 852 A.2d 491, 513 (R.I.2004)).

#### 2. Defendant's Intoxication and Miranda Waiver

At the suppression hearing, the trial justice heard testimony from Det. Winman, Mr. Townsend, and defendant. The defendant testified that on the morning of June 26, 2006, three days after the homicide, he purchased a liter of vodka, filled a prescription for Klonopin, took a Klonopin, and then continued home, where he drank three to four glasses of vodka. The defendant proceeded to sit outside and converse with his neighbor, Mr. Townsend, during which time defendant consumed three vodka drinks. Mr. Townsend described him as "kind of out of focus," and recalled that he "jump[ed] around" when discussing recent events; Mr. Townsend was, however, able to understand what defendant was saying.

Detective Winman went to defendant's home at approximately 4:30 p.m. on that day to effect an arrest warrant on defendant, and he found defendant standing outside. The defendant testified that he had a glass of vodka in his hand and told the

detective that it was vodka. Detective Winman, however, testified that defendant never indicated that he had been drinking. Detective Winman asked defendant to return to police headquarters, explaining that questions had arisen from the medical examiner's report, and defendant agreed. The defendant was taken uncuffed to headquarters and brought into the same interview room that he had been in on June 23. The defendant admits that he never told the police that he was too intoxicated to give a statement.

Detective Winman read defendant his constitutional rights, and defendant signed a form acknowledging such. The entire interview was videotaped, and the trial justice viewed the videotape, in full, at the suppression hearing. Detective Winman, who has training and experience in the detection of alcohol and drug-related activity, testified that there was nothing to cause him to be concerned that defendant was intoxicated or impaired during the interview. In his memorandum supporting the motion to suppress, defendant argued that his statement was not voluntary because of his intoxication, sleeplessness, and state of depression, and that the pressure by police exceeded his ability to resist.

In denying the motion to suppress, the trial justice found that, even assuming defendant had consumed alcoholic beverages and ingested Klonopin, "Det[.] Winman's highly credible testimony belies that the [d]efendant was too intoxicated to provide voluntary, reliable answers during questioning on the 26th." In addition, having watched the entire videotaped interview, the trial justice revealed his own observations:

"The [d]efendant appeared poised and calm. He used readily understood language, did not slur his words, and appeared to be fully capable of intelligent thought processes and speech. He readily engaged in dialog with the detectives. He was not so intoxicated or afflicted with mental health issues as to make his decision to give a statement involuntary.

" * * *

"The demeanor and speech pattern shown by the [d]efendant's videotaped interview after his arrest on the 26th is similar in many respects to those which he exhibited on the 23rd. Except while demonstrating some physical act or using his hands to emphasize a point, the [d]efendant remained calm with good posture while seated. Similar to the interview three days earlier, the [d]efendant frequently kept his arms folded across his chest and maintained steady eye contact. Although his voice was lower in volume than during the first taped interrogation, his subdued manner is understandable. He had just been arrested for murder. Yet he signed the rights form without hesitation, remained erect in his chair and never broke down."

The trial justice further concluded that defendant failed to sufficiently show how the police conduct was coercive. The trial justice explained that there was no aggressive or inappropriate activity by the police; simply admonishing defendant to tell the truth, and pointing out facts that were not adding up, did not amount to coercion. The trial justice further remarked that:

"Perhaps the most convincing evidence that the police did not use coercion to obtain a statement is the final portion of the interrogation. For about ten minutes at the end of the session, the [d]efendant provided an almost totally unprompted narration of his interaction with the deceased during the night and morning of her death. This was a detailed, articulate, steady narrative of events * * *."

We cannot say that these findings are clearly erroneous. Indeed, the trial justice's determination of these historical facts is firmly grounded upon Det. Winman's testimony and upon defendant's actions that are displayed in the videotaped interview. Accordingly, we accept the trial justice's findings of historical fact and proceed to review *de novo* his determination of the voluntariness of defendant's statement.

■ "The definitive test of the voluntariness of a statement is whether, after taking into consideration the totality of the circumstances, it was the product of the defendant's free will or was instead the result of coercion that overcame the defendant's free will at the time that it was made." *Perez*, 882 A.2d at 589.

■ In denying the motion to suppress, the trial justice found that defendant "exhibited no signs of drug or alcohol use during the interview, and even if he had, there was no proof that it overcame his will to resist or made his confession involuntary." [20] The trial justice concluded that "there is no doubt, based upon the totality of the circumstances, that the statement was knowingly given, voluntarily given, without any inappropriate coercion on the part of the detectives."

Having carefully reviewed the record, considering the totality of the circumstances and applying the trial justice's findings of historical fact, we concur with the trial justice's conclusion that defendant's statement was voluntary. The defendant argues before this Court that because prior to the interview the police were aware that defendant was an alcoholic with mental health problems, that knowledge made their actions improper and defendant's statement involuntary. We disagree. Even if the police knew of defendant's alcohol problems, they did not act in an improperly coercive manner. The defendant was properly informed of his rights, and there is no evidence revealed within the videotape or elsewhere that defendant was subjected to coercion or that he was intimidated in any way. Accordingly, we agree with the trial justice that defendant's statement was voluntary and was not the product of an overborne free will.

### 3. Defendant's Request For Counsel

■ The defendant made an oral motion midtrial to suppress the June 26, 2006 statement on an alternative ground, namely, that defendant had invoked his right to counsel and, by continuing to interrogate him, the police violated his constitutional rights.[21] The trial justice denied defendant's motion on both procedural and substantive grounds. Procedurally, the trial justice found the motion to be untimely.

---

**20.** It is observed that "proof of intoxication alone, absent a showing of coercive police activity, is not sufficient to suppress a confession." *State v. Page*, 709 A.2d 1042, 1045 (R.I.1998) (quoting *Brown v. Moran*, 534 A.2d 180, 183 (R.I.1987)); *see also Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.").

**21.** In arguing that he unequivocally requested counsel, defendant relied on the following exchange, which occurred after the detective read defendant his *Miranda* rights:

"Mr. Mlyniec: Okay. What I wanted to say was this is my second interview right here. Um, should I have an attorney?
"Det. Winman: That's—
"Mr. Mlyniec: And if I do—
"Det. Winman:—that's your decision.
"Mr. Mlyniec: I have to get a public defender, so, I mean, I don't know how quickly you can do that. *I just want to hear some new questions first, I don't have to answer every questions [sic].*
"Det. Winman: You don't have to answer any questions.
"Mr. Mlyniec: Okay." (Emphasis added.)

The trial justice noted that this argument was known by defendant and his attorney for "a lengthy period of time" prior to trial, and he explained that "filing [the] motion at this late date puts the [s]tate at an unfortunate disadvantage." Thus, the trial justice denied the motion. Nevertheless, the trial justice also proceeded to find that even if it had been timely, the motion to suppress lacked merit because defendant did not unequivocally request an attorney and, even if he had, he waived his right to an attorney when he made subsequent statements.

This Court established, in *State v. Maloney*, 111 R.I. 133, 144, 300 A.2d 259, 265 (1973), that "in all criminal trials conducted subsequent to the filing of this opinion, efforts to suppress evidence must be, by motions, made and heard prior to trial." "This rule is necessary because postponement of the suppression hearing until after trial has begun would subvert the state's right to appeal [the] suppression, because jeopardy then would have attached." *State v. Francis*, 719 A.2d 858, 859 (R.I. 1998). The defendant had the necessary information to be able to make this argument prior to trial in his written motion to suppress or during the pretrial hearing on the motion to suppress, but he clearly failed to do so. Rather, the first time defendant raised this argument was mid-trial. We are of the opinion that the motion therefore was untimely and was appropriately denied by the trial justice as such. Accordingly, we affirm the trial justice's denial of defendant's motion to suppress.

## B

### Admissibility of Melissa Audet's Testimony

The defendant next argues that the trial justice erred, violating Rule 403 of the Rhode Island Rules of Evidence, by allowing Ms. Audet's testimony under Rule 404(b) of the Rhode Island Rules of Evidence.

Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Rule 403 cuts across the rules of evidence and is always a consideration in a trial justice's ruling on the admissibility of Rule 404(b) evidence." *State v. Gaspar*, 982 A.2d 140, 148 (R.I. 2009). This Court has said that "a trial justice's discretion to exclude evidence under Rule 403 must be used sparingly," and "[i]t is only when evidence is marginally relevant and enormously prejudicial that a trial justice must exclude it." *State v. DeJesus*, 947 A.2d 873, 883 (R.I. 2008).

"It is within the sound discretion of the trial justice whether to admit or exclude evidence under Rule 403." *State v. John*, 881 A.2d 920, 927 (R.I. 2005). Accordingly, we review the trial justice's decision for clear abuse of discretion and will not disturb such a determination on appeal absent clear abuse of discretion. *Id.* at 927–28.

The defendant argues that the probative value of Ms. Audet's testimony was substantially outweighed by the danger of unfair prejudice and that the testimony confused the jury concerning which case to decide. The trial justice found that "[t]aken in totality, * * * the probative value of Ms. Audet's testimony is not substantially outweighed by the danger of un-

fair prejudice to the defendant" and "that Ms. Audet's testimony is both necessary and may tend to establish intent to kill, and absence of mistake or accident." We agree. The testimony was highly probative and clearly outweighed the potential for unfair prejudice. Moreover, we observe that in an effort to ensure that the testimony was not unfairly prejudicial, the trial justice carefully excluded the testimony of another witness about an incident in 1992, noting its remoteness and its potential to be cumulative. The trial justice further prevented unfair prejudice by barring the state from addressing defendant's alcohol or drug use during Ms. Audet's testimony. Finally, to prevent the jury from being misled or confused, the trial justice issued an appropriate limiting instruction to the jury before the testimony.[22] Accordingly, we are of the opinion that the trial justice's ruling allowing Ms. Audet's testimony was not an abuse of discretion nor did it violate Rule 403.

The defendant further argues, citing *Gaspar*, that "fairness should have dictated that the prosecution withhold Ms. Audet as a rebuttal witness," rather than allowing her as a witness in the state's case-in-chief. Contrary to defendant's contention, this Court never has held, even in the broadest reading of *Gaspar*, that the state may not use Rule 404(b) testimony during its case-in-chief to prove its case. *See, e.g., State v. Brown,* 900 A.2d 1155, 1162–63 (R.I.2006). To meet its burden of proof, the state was tasked with proving the elements of first-degree murder beyond a reasonable doubt. The trial justice allowed Ms. Audet to testify specifically because her testimony was evidence of intent, preparation, plan, knowledge, and absence of accident, reasons which defendant does not challenge on appeal. Thus, the state was entitled to use Ms. Audet's testimony, which went directly to the issue of whether Ms. Anderson's injuries were accidental. It cannot be said, therefore, that this testimony was used solely to impeach anticipated testimony.[23] Thus, we perceive no basis for concluding that the trial justice abused his discretion when he permitted the state to elicit testimony from Ms. Audet during its case-in-chief.

## C

### Recusal

The defendant next argues that the trial justice erred in refusing to recuse himself from presiding over the trial on account of his alleged bias and the appearance of impartiality resulting from the trial justice's previous participation in a federal investigation involving defense counsel.

 It is well established that judicial officers are obligated to recuse themselves if they are "unable to render a fair

---

**22.** The trial justice instructed the jury:

"The testimony of Melissa Audet will relate to events prior to June 22/23, 2006. You may find that this evidence relates to activity of the defendant which could be characterized as misconduct. Such evidence cannot be used by you to judge the character of the defendant. The evidence presented through the testimony of Melissa Audet, to the extent that you decide to consider it at all, is admitted only and exclusively for the limited purpose as you may find in your minds relates to the defen-dant's plan, intent, knowledge, preparation or absence of mistake or accident, with respect to the specific charge for which he is presently on trial. That is the only purpose for which you can consider her testimony."

**23.** Even if Ms. Audet's testimony had been admitted solely for impeachment purposes, we are satisfied that such testimony would have been proper in the state's case-in-chief because the videotapes of defendant's police statements given on June 23 and 26, 2006, already had been placed into evidence.

or an impartial decision in a particular case." *Kelly v. Rhode Island Public Transit Authority*, 740 A.2d 1243, 1246 (R.I.1999); *see also Mattatall v. State*, 947 A.2d 896, 902 (R.I.2008). "At the same time, however, justices have an equally great obligation **not** to disqualify themselves when there is no sound reason to do so." *Ryan v. Roman Catholic Bishop of Providence*, 941 A.2d 174, 185 (R.I.2008); *see also State v. Clark*, 423 A.2d 1151, 1158 (R.I.1980). The burden is on the party seeking recusal to set forth facts establishing that the justice possesses a "personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his [or her] impartiality seriously and to sway his [or her] judgment." *Mattatall*, 947 A.2d at 902 (quoting *Cavanagh v. Cavanagh*, 118 R.I. 608, 621, 375 A.2d 911, 917 (1977)).

■ The defendant's motion to recuse followed the trial justice's disclosure that approximately thirty years before then he had some involvement as a federal attorney in an investigation that led to the prosecution and conviction of defense counsel for having practiced law without a license.[24] During a hearing on the motion to recuse, defendant stated that he was "shocked" to hear about the prior involvement, and believed it would be common sense to assign another justice "if there's any possible chance of any impropriety." The trial justice denied the motion.

In denying the motion, the trial justice noted that recusal issues generally relate to the litigant, not his or her counsel. This Court has stated that "[o]rdinarily [a trial justice] is not disqualified by prejudice or bias against the attorney of a party." *State v. Storms*, 112 R.I. 454, 456–57, 311 A.2d 567, 569 (1973). "Although extraordinary bias against a lawyer can constitute sufficient grounds to disqualify a judge, '[g]enerally the only prejudice which will disqualify a judge, except for statutory disqualification for interest, is a personal prejudice for or against *a party to the cause.*'" *In re Yashar*, 713 A.2d 787, 790

---

**24.** The trial justice explained to defendant, on record:

"One thing I told your attorney I felt I had to do was to disclose to you what [defense counsel] already knows, and that is a prior professional relationship that I suppose I have had with the attorneys in the case.

"* * *

"In or around 1979, I, together with a state prosecutor, supervised or, I suppose, we were consultants to the Federal Bureau of Investigation and the Rhode Island State Police concerning an investigation they were conducting. It was an undercover investigation which involved an undercover FBI agent and a citizen from the State of Connecticut who came to Rhode Island and lived undercover as a potential witness for around six months.

"During the period of the investigation, it came to my attention that your current attorney, [defense counsel], had conversations with that undercover witness and that resulted, ultimately, in your attorney, [defense counsel], being charged with, I believe, a petty misdemeanor in the State of Rhode Island. The charge, as I recollected, was practicing law without a license. Even though he had been previously a long-time prominent attorney here in the [s]tate, he did not, at that time, apparently, have a law license.

"[Defense counsel], I think, went to trial. He will explain that to you in greater detail. He was tried in the [s]tate courts of Rhode Island. I had nothing to do with the state courts in Rhode Island. I believe he was convicted. He served a short jail sentence, and that's about all I know about it. I felt you deserved to know that, although I didn't prosecute your attorney, I was aware of the investigation which eventually resulted in him being charged.

"Do you understand all of that, Mr. Mlyniec?

"* * *

"It's ancient history, but I think you have a right to know that."

(R.I.1998) (quoting *Storms,* 112 R.I. at 456, 311 A.2d at 569). There is nothing in the record to persuade us that the trial justice had any type of "extraordinary bias" against defense counsel in this case. In fact, it is significant to note that defense counsel himself, during both the motion hearing and closing arguments, described the trial justice as fair.[25]

Furthermore, this Court has stated that "[f]eelings of a criminal defendant, which may well be subjective, cannot without more constitute the test for the disqualification of a trial judge." *Clark,* 423 A.2d at 1158. Rather, "[o]nly in those instances where it can be determined that a reasonable person would question the trial justice's impartiality should a motion to recuse be granted." *In re Amelia,* 655 A.2d 256, 256 (R.I.1995) (mem.). "[R]ecusal is not in order by a mere accusation that is totally unsupported by substantial fact." *Clark,* 423 A.2d at 1158. In denying the motion, the trial justice noted that defendant presented no facts that would give rise to the conclusion that the trial justice actually was biased against him, and he determined that "[n]o reasonable person could believe that a solitary event which occurred more than thirty years ago would have any effect on the decisions of this Court in the instant action." We agree. The defendant has failed to assert any specific facts supporting a finding of bias, prejudice, or impartiality against him. Additionally, although defendant contends that there is an improper appearance of impartiality, we do not believe that a trial justice's tangential involvement with an attorney over three decades ago, creates an improper appearance of impartiality or would lead a reasonable person to question such. Therefore, we are of the opinion that the trial justice did not err by denying defendant's motion to recuse.

## D

### Life Sentence Without Parole

Finally, defendant argues that the trial justice erred in imposing a sentence of life without parole and prays that this Court reduce his sentence to life imprisonment with the possibility of parole.

General Laws 1956 § 12–19.2–5 grants this Court specific statutory authority to review and reduce sentences of life without parole on direct appeal:

"The defendant shall have the right to appeal a sentence of life imprisonment without parole to the supreme court of the state in accordance with the applicable rules of court. In considering an appeal of a sentence, the court, after review of the transcript of the proceedings below, may, in its discretion, ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment."

 "In cases in which a sentence of life imprisonment without the possibility of parole has been imposed, we have held that it is incumbent upon this Court to exercise independent judgment and discretion in deciding the appropriateness of the sentence." *State v. Pacheco,* 763 A.2d 971, 981 (R.I.2001). In other words, this Court will conduct a *de novo* review. *State v. Motyka,* 893 A.2d 267, 288 (R.I.2006). In so doing, this Court examines the total record, the jury's findings, the trial justice's conclusions, and reviews the personal character, record, and propensities of the defendant, including any aggravating circumstances as well as any mitigating factors. *State v. Graham,* 941 A.2d 848, 866

---

**25.** During closing arguments, defense counsel told the jury that "[the trial justice] is one of the fairest judges in the court system."

(R.I.2008); *State v. Wilson,* 568 A.2d 764, 769 (R.I.1990).

The trial justice imposed the sentence of life without parole after a sentencing hearing, in accord with § 12–19.2–4.[26] At the sentencing hearing, the trial justice had been presented with remarks from Ms. Anderson's daughter and a letter from Ms. Anderson's sister, both urging for the maximum sentence. The trial justice also heard arguments by counsel for both parties, listened to an allocution statement by defendant, read a letter submitted by defendant, and reviewed the presentence report. We feel it is appropriate to include in our decision today the particularly telling words of the trial justice, explaining his conclusion that defendant merited the most extreme penalty allowed under Rhode Island law:

"I agree wholeheartedly with [the jury's] finding that this murder was committed in the manner involving aggravated battery.

" * * *

" * * * I find, and the jury I'm sure found, that the defendant disabled the victim beyond what she was already feeling due to the ingestion of illicit drugs and perhaps prescription drugs. He plied her with alcohol. He, at some point, began to beat her all over her body, and that did not happen in a few seconds or a few minutes.

"The exhibits that were introduced during trial were some of the most graphic I have ever seen * * *. [The photographs] * * * show how savagely [Ms.] Anders[o]n was beaten.

"This did not occur by a fall in the bathroom or two falls in the bathroom or five falls in the bathroom. More than likely [Ms.] Anders[o]n was beaten while she was bound by wire cable.

"Now, there is some evidence that [Ms.] Anders[o]n enjoyed sexual activity while bound with scarves and there were scarves at the premises within her personal belongings, which were carried to [the] residence by the defendant on the evening of June the 22nd. He knew that they were there.

"What makes this Court believe beyond a shadow of a doubt that she was bound without her consent is the defendant's use of a television cable and Walkman wire earpiece cable to hogtie her. [Ms.] Anders[o]n was repeatedly, for an extensive period of time, sexually assaulted both vaginally and anally by the defendant using his fingers and fist. He explained to the police officers and to the jury how that occurred, and I don't believe him.

"I think this was some bizarre, evil form of punishment that the defendant was giving to the victim. Had she survived, she would have required surgical reconstruction of her vagina and anus. They were that badly mutilated.

"Finally, he strangled [Ms.] Anders[o]n to death. * * * [B]ased upon

---

**26.** General Laws 1956 § 12–19.2–4 provides:

"At the presentence hearing, following a finding that one or more of the circumstances enumerated in § 11–23–2 or 11–23–2.1 as the basis for imposition of a sentence of life imprisonment without parole was involved in the first degree murder of which the defendant has been convicted, the court shall consider evidence regarding the nature and circumstances of the offense and the personal history, character, record, and propensities of the defendant which are relevant to the sentencing determination. After hearing evidence and argument regarding the aggravating and mitigating circumstances relating to the offense and the defendant, the court shall, in its discretion, sentence the defendant to life imprisonment without parole or to life imprisonment. The court shall state on the record its reasons for imposing its sentence."

the evidence primarily from Dr. Gillespie, the medical examiner I found to be highly credible, the strangulation which occurred here * * * involving the fracture of the hyoid bone, didn't occur in just a few seconds for death to result as it did here. There must be substantial force, which after 30 seconds generally results in unconsciousness of the victim but death does not occur for three to four or more minutes.

"So the defendant applied deathly pressure to the neck of [Ms.] Anders[o]n for a substantial period of time demonstrating his clear intent to kill her.

"For reasons we will never know for sure, the defendant placed [Ms.] Anders[o]n in a bathtub of water. * * * [T]he defendant must have known by that time that he had likely succeeded in his goal because he submerged the entire body, including her head, under water, and there were no bubbles.

"Thus, this horrific incident lasting over perhaps six hours is clearly a case of murder by aggravated battery. And I find that this defendant acted in a most violent and depraved manner. He has a history of this. * * *

"This Court remembers vividly the testimony by the North Kingstown victim * * *, which I felt was powerful and truthful, and chillingly similar in its detail as to what occurred here.

"In the North Kingstown case, the defendant disabled the victim there with drugs and alcohol. When she passed out, he bound her against her will and without her consent and kept her bound despite her protestations that she wished to be released. He beat her face much to her shock. He violated her repeatedly anally with his fingers and/or fist. I felt during trial, and I feel for purposes of sentencing, that this prior conduct is very significant.

"* * *

"Well, I find that although the defendant consumed substantial alcohol on the dates in question, June 22 into June 23, he was not in any way enjoying diminished capacity. There is really no evidence of that other than through the defendant's own comments and testimony. Several neighbors saw him in the early morning hours of June 23 and to them he did not appear to be intoxicated or impaired. He communicated readily with a number of people even at around midnight, probably at about the time he murdered [Ms.] Anders[o]n. He had an extensive conversation with his long-time friend who testified at trial that although some of the comments by [defendant] were bizarre, he could understand him perfectly.

"So although he may, and I find that he does suffer from alcoholism and has a history of drug abuse, those factors were not present during the time of the murder and they in no way excuse his conduct.

"* * *

"It was a death that, quite frankly, I don't understand, but I have no doubt that it was murder in the first degree and committed by aggravated battery. Totally senseless.

"This defendant under certain circumstances snaps. He snapped here. He snapped in North Kingstown six years before.

"* * *

"I find, despite his protestations to the contrary, that [defendant] lacks any true remorse. He does not accept responsibility for any of his conduct, let alone the murder, and as exhibited in this case, by his savage beating and strangulation of [Ms.] Anders[o]n. I find that this defendant has a truly evil side to his persona. I find that there is

virtually no likelihood that [defendant] can ever be rehabilitated, never be made to be safe, no counseling, no term of imprisonment will ever provide safety to society that it deserves from [defendant], because I find him to be an extreme danger to our society."

█ In light of the trial justice's credibility determinations, the jury's finding of aggravated battery, and our independent review of the record, we concur with the trial justice's conclusions. The record discloses ample evidence that the victim was sexually assaulted and beaten all over her body for an extensive period before enduring a slow and agonizing death. The state medical examiner indicated that defendant must have applied a large amount of pressure for at least three to four minutes to strangle Ms. Anderson.

█ Furthermore, we are mindful that this most extreme sentence should be reserved for a "narrow class of the most heinous crimes," State v. Brown, 898 A.2d 69, 86 (R.I.2006); however, after subjecting this record to our independent review, considering the horrific circumstances of the actions perpetrated by this defendant, and just as importantly, his prospects for rehabilitation, we hold that the sentence of life imprisonment without the possibility of parole was appropriate. The graphic and gruesome photographs, the autopsy results, and the testimony of Ms. Audet, all belie defendant's tale of a night of drinking and enjoyable consensual sexual activities; rather, they reveal the story of a "most heinous" crime indeed.

There is nothing in the record indicating that defendant has, to this day, shown any real remorse for what he has done. See Graham, 941 A.2d at 867 (considering the defendant's remorse when reviewing the appropriateness of life imprisonment without the possibility of parole). On the contrary, a letter sent by defendant to his probation officer, attached to the presen-

tence report, exhibits a total lack of remorse. The letter says, in pertinent part: "Without any doubt in my mind, [Ms.] Anderson was playing 'Russian Roulette' with her life, and I believe that no matter who she was with, her death was imminent."

The defendant's want of compunction, coupled with his troubling character and propensity for similar criminal activity, persuade this Court that it is unlikely he could ever be rehabilitated.

The defendant contends that mitigating circumstances, including his severe alcohol problems, make the imposition of a life sentence without parole improper. We disagree. As the trial justice properly noted, testimony from multiple witnesses who spoke with defendant during the night and morning at issue reveal that defendant was not drunk to a point where he could be deemed impaired. After reviewing the presentence report and defendant's letter, and examining the record, we acknowledge that defendant has an unfortunate alcohol problem; and, although it is a factor to be considered, we are not persuaded that it justifies a reduction in his sentence or in some way excuses his actions.

Therefore, after carefully considering the evidence in the exercise of our independent judgment and discretion, we affirm the sentence imposed by the trial justice.

## III
### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

Justice INDEGLIA did not participate.