STATE

v.

Hamlet M. LOPEZ.

No. 2009–280–C.A.

Supreme Court of Rhode Island.

June 22, 2012.

Jane M. McSoley, Department of Attorney General, Providence, for State.

Janice M. Weisfeld, Office of the Public Defender, Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The defendant, Hamlet M. Lopez, appeals from a Superior Court judgment of conviction for first-degree murder, for which he received a sentence of life imprisonment without the possibility of parole. On appeal, the defendant argues that the trial justice erred by (1) allowing DNA evidence to be introduced against him through the testimony of a laboratory su-

pervisor and the admission of an allele table documenting the DNA profiles of the defendant and the decedent; (2) admitting evidence of his prior instances of violence; (3) failing to instruct the jury adequately about prior inconsistent statements; and (4) imposing a sentence of life imprisonment without the possibility of parole. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

I

**Facts and Procedural History**

On August 29, 2007, defendant was indicted by a grand jury for the murder of Miledis[1] Hilario (Hilario or decedent), in violation of G.L.1956 § 11–23–1.[2] Thereafter, the state filed notice of its intention to seek a sentence of life without parole pursuant to § 11–23–2(4), which permits such a sentence for the commission of a murder involving torture or aggravated battery.[3]

The defendant made several pretrial motions, which were heard by the trial justice on September 8, 10, 15, and 16, 2008. Included among these motions was defendant's motion *in limine* to exclude, under Rules 403 and 404 of the Rhode Island Rules of Evidence, evidence of defendant's prior acts of violence against Hilario and Ruth Estrella, a former girlfriend of defendant and mother of one of his sons.[4] The state responded by stating that it did not intend to produce evidence regarding defendant's past instances of violence against Estrella. The state asserted, however, that it did intend to elicit testimony about three prior incidents between defendant and Hilario, occurring on November 11, 2006, in early May 2007, and on May 18, 2007, and it argued that those incidents were admissible to show defendant's motive and intent to murder Hilario on May 20, 2007. On September 8, 2008, the trial justice heard this motion and ruled that evidence of the November 11, 2006 event would be excluded, but that evidence of both May 2007 incidents would be admissible pursuant to Rule 404(b) of the Rhode Island Rules of Evidence.

A jury trial then commenced in the Superior Court on September 17, 2008. The pertinent evidence adduced at trial is set forth below.

The defendant began dating Hilario toward the end of 2005. A few months later,

---

1. Although Ms. Hilario's surname appears as "Miledys" in the indictment and various other documents, we use "Miledis" as it appears throughout the transcripts and in her daughter's witness statement.

2. General Laws 1956 § 11–23–1 states, in pertinent part: "The unlawful killing of a human being with malice aforethought is murder. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing * * * is murder in the first degree."

3. Section 11–23–2 provides, in relevant part: "Every person guilty of murder in the first degree shall be imprisoned for life. Every person guilty of murder in the first degree: * * * (4) committed in a manner involving torture or an aggravated battery to the victim; * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 that person shall not be eligible for parole from imprisonment."

4. This motion *in limine* and the state's objection to it have not been produced in the Superior Court record. These documents, however, are attached as exhibits to defendant's brief before this Court. Although these documents apparently were not properly filed in the Superior Court, the trial justice reviewed and considered them at the pretrial hearing on September 8, 2008, stating: "in light of the fact that the file does not contain the defense memorandum with regard to the second motion *in limine*, I'll take a few minutes to read that motion along with the [s]tate's motion and then we'll have a hearing on the [R.I. R. Evid.] 404(b) issue."

defendant moved in with Hilario and began living with her and her youngest daughter, Miledy Urena, at 42 Courtland Street in the City of Providence. According to the testimony of Hilario's family, her relationship with defendant was "bad" and ultimately ended in May 2007,[5] a short time before her murder.

Miledy[6] testified that her mother's relationship with defendant began to deteriorate in the summer of 2006. Miledy stated that this was a result of defendant's constant "lies" and his continued relationship with Estrella. As a result, Miledy advised her mother "[m]any times" to end her relationship with defendant. According to Miledy, Hilario finally took this advice in early May 2007, after a physical altercation with defendant. Miledy testified that during the altercation, she witnessed defendant being physically aggressive to her mother. Miledy explained that her mother and defendant were arriving home when she overheard them arguing outside, so she went to her bedroom window to see what was happening. There, she saw defendant push Hilario, causing her to fall to the ground and scrape her knee. After observing this, Miledy stated that she ran downstairs and then helped her mother upstairs, with defendant following behind. Miledy testified that, once upstairs, her mother took all of defendant's belongings, put them in garbage bags, and threw them out the window.[7] The defendant then went outside to retrieve his belongings and, according to Miledy, Hilario "closed the door and * * * locked him out." Mile-

dy stated that it was at that time that her mother ended her relationship with defendant.

The next time Miledy recalled seeing defendant was on May 18, 2007. That afternoon, as Miledy and Hilario arrived home, defendant came by the house with a dozen roses for Hilario. According to Miledy, defendant apologized for "what happened" and tried to give Hilario the roses, but she refused to take them. Miledy eventually took the roses upstairs into the apartment. When Miledy came back downstairs, defendant was gone.

Miledy testified that her older sister, Keyla Urena, picked her up from work that evening around eleven o'clock. When they arrived home, Miledy knocked on the door, rang the doorbell, and called her mother multiple times, but received no response. Seeing that her mother's van was parked in the driveway and the lights in the apartment were on, she persisted in her efforts to receive entry. After approximately twenty minutes, Keyla called her mother and defendant answered. Miledy continued to knock on the door and ring the doorbell, and eventually, Hilario answered the door and let Miledy upstairs. Miledy testified that she did not see defendant upstairs at this time or at any time that evening, but she believed he had been "inside the house and [had] left [out] the back door" because that is what her mother had told her.

Miledy recalled that her mother's "face was red," and that "she was nervous and

---

**5.** On direct examination, the state's attorney evidently misspoke and questioned Miledy about May 2008; however, it is clear that the state intended to inquire about May 2007, because Hilario was murdered on May 20, 2007.

**6.** In this opinion we refer to Miledy Urena as "Miledy" and Keyla Urena as "Keyla" for the purpose of clarity; we intend no disrespect.

**7.** Defense counsel attempted to discredit this testimony with the testimony of Cesar Tineo, Hilario's son, who testified that in the beginning of May 2007, he went to his mother's house and "took all of [defendant's] stuff, put it in [his] car and took it to" defendant.

* * * pacing everywhere," while talking loudly on the telephone to defendant's sister. Miledy stated that she heard her mother say "[defendant] broke my bed" and "[defendant] was harassing me." After hearing this, she went to see her mother's bed, took off the sheets, and discovered that "the mattress was stabbed up." Miledy then called Keyla and asked her to come back to the house. Minutes later Keyla arrived and thereafter called the police.[8] The police spoke to Hilario, Miledy, and Keyla, took photographs of the mattress, and took a statement from Hilario.[9]

Cesar Tineo, Hilario's son, testified that after speaking with one of his sisters on May 18, 2007, he called defendant and asked him "[h]ow he [c]ould do such a thing." Tineo attested that defendant responded: "She's playing with my emotions and she's going to die in the hands of a man." Thereafter, according to Tineo, he went to his mother's home and immediately changed all of her locks. This was not the only ominous threat that defendant allegedly made in the days leading up to Hilario's murder.

Jose Marte, a longtime friend of defendant's and boyfriend of Cruz Gonzalez, Hilario's sister, testified that on May 16, 2007, defendant called him and "was very angry and * * * sad" because "he was having problems with [Hilario] and he wanted [Marte] to help him get back [with]

her." Marte met with defendant later that night, and testified that defendant "was very angry" and told him he was "deeply in love" with Hilario and that "if she wasn't going to be his, she was not going to be anybody's."

Miledy testified that on May 20, 2007, she worked from 2 to 9:30 p.m., and that her mother dropped her off at work and was supposed to pick her up that evening. While she was at work, Miledy received a total of five telephone calls from defendant; the earliest call being placed at 2:32 p.m. and the last one at 8:20 p.m. Miledy did not answer any of these calls. At the end of her shift, Miledy waited for her mother, and when she did not arrive on time, she called her multiple times to no avail.[10] Miledy testified that she then called Keyla, who picked her up around 10:20 p.m. The sisters drove to 42 Courtland Street, where they observed the second-floor apartment's lights on, but did not see their mother's van. Because the van was not there, the girls started driving to their aunt Marisol's house. On the way, Miledy called defendant, and he informed her that Hilario was at Marisol's house.

Immediately after arriving at Marisol's house, but before getting out of the car, Miledy received an "anxious" telephone call from her other aunt, Cruz Gonzalez. Miledy testified that, after this five-minute conversation, she and her sister called the police while they hurriedly made their way

---

**8.** Miledy testified that Keyla waited to call the police because Hilario ran a daycare at her home and still had a child sleeping in the house, and she wanted the child to be picked up before the police arrived.

**9.** Officer Paul Principale of the Providence Police Department testified to receiving a dispatch call at 10:40 p.m. on May 18, 2007, to which he responded to 42 Courtland Street. There, he stated that he spoke with Hilario, whom he described as being "upset, [and] physically trembling." He also described ob-

serving Hilario's mattress and seeing "some damage to both the top and underside of the mattress." Officer Principale further testified that on the morning of May 19, 2007, Hilario came to the police station and stated that she did not wish to file a formal complaint concerning the prior evening's incident.

**10.** Miledy testified that at 9:45 p.m. she received a call from her mother, but could not recall why she had not answered that call.

back to 42 Courtland Street. Miledy urgently requested help from the police, exclaiming "[t]hey gonna kill her, please."[11] At approximately 11:30 p.m., Miledy, Keyla, and the police arrived at 42 Courtland Street. Miledy testified that she went inside the house and saw her mother lying "[f]ace up" on the floor, bleeding. According to Miledy, the police then quickly escorted her out of the apartment.

Officer Julie Pryde of the Providence Police Department was the first officer to arrive at the crime scene. She testified that once there, she observed that Keyla and Miledy were "hysterical," and that Keyla came running to her and yelled, "[d]o you have your gun? * * * I think he's still up there with a knife." Officer Pryde then went upstairs to the second-floor apartment and discovered a motionless Hilario lying on her back in the threshold between the living room and her bedroom, with blood on her clothing and chest. Officer Pryde further indicated that there "appeared * * * [to] have been a struggle" in the living room because a glass-top table was knocked over, papers were strewn about, and there were blood splatters on the living-room carpet. Immediately upon observing this scene, Officer Pryde called for rescue personnel. After the rescue crew arrived, Hilario was pronounced dead at the scene.

Testimony revealed that defendant made several telephone calls both before and after the murder took place.[12] Marte and Gonzalez testified that they had received multiple telephone calls from defendant that evening, none of which they answered. According to their testimony, however, at some point that evening either Marte or Gonzalez called defendant back.[13] Marte testified that defendant answered and stated three times that he had killed Hilario. Marte further testified that Gonzalez then pled with defendant to tell her where her sister was so that she could get Hilario help. Gonzalez testified that she called defendant a second time and asked where her sister was. Gonzalez stated that she then told defendant that "he was going to pay because of what he had done" and that defendant responded that "he was going to finish with all [her] family." Gonzalez testified that she was in her bedroom during these telephone calls and that her boyfriend, Marte, was very close by her side and was able to hear these two conversations. After the second exchange, Gonzalez stated that she told her son to call 911 and that she then called her nieces and informed them that they needed "to be strong, but someone had killed their mother."

The defendant's son, Emmanuel Lopez–Sanchez, also testified to receiving multiple telephone calls from defendant on the evening of May 20, 2007.[14] That evening,

11. When asked at trial whom she was referring to when she said "they," Miledy indicated that she had been referring to defendant.

12. At trial, Estrella testified to having received an upsetting telephone call the evening of May 20, 2007. However, despite having previously identified the caller to police and the grand jury as defendant, Estrella refused to identify the caller as such at trial, stating instead that "[she did not] know. It could have been [her] son's father."

13. Marte's testimony is inconsistent in this regard. At various times he testified that he called defendant back; but at other times, he insisted that Gonzalez made the telephone call to defendant. Gonzalez, however, testified that she was the one who eventually called defendant back.

14. On cross-examination, Lopez–Sanchez acknowledged that, despite his testimony before the grand jury that he had received between twenty and twenty-five telephone calls from defendant that evening, in actuality only five telephone calls had been exchanged.

Lopez–Sanchez received a telephone call from defendant at 10:17 p.m., in which defendant tearfully stated: "I killed my girlfriend. I killed my girlfriend. I'm going to kill myself." After this call, Lopez–Sanchez testified that he waited approximately an hour and a half before calling the police while he was trying to understand what was going on.[15] Lopez–Sanchez indicated that he finally called the police because he "[f]ear[ed] for his [father's] life." Once in contact with the police, Lopez–Sanchez informed them that defendant had stated that he was going back to his home on Bellevue Avenue.

The defendant later was apprehended at his home at 39 Bellevue Avenue. Officer Michael P. Comerford testified that after an initial examination of the premises, the officers'[16] attention was drawn to the garage because of a startling noise coming from the area. After prying the garage door open, the officers discovered defendant standing next to Hilario's van; he was wearing jeans and a multicolored polo shirt, both of which, according to Officer Comerford, appeared to have "dried blood" and "other debris" on them. The defendant was held at gunpoint, ordered to the ground, handcuffed, and taken into police custody. At the police station, two cellular telephones were seized from defendant, one later identified as belonging to Hilario. Additionally, defendant's clothes were seized by Detective–Sergeant Joseph Donnelly of the Bureau of Criminal Identification (BCI). The defendant's clothing then was placed in a brown paper bag and given to Detective Robert Yekelchik of the BCI.

Detective Yekelchik also retrieved evidence from 42 Courtland Street. He testified that evidence seized at the scene included: a large kitchen knife and a manila folder found not too far from Hilario's body, both of which appeared to be blood-stained; a medium-sized, serrated steak knife found in the bathroom sink, which appeared to have been rinsed off; a knife found in a strainer in the kitchen pantry; a beer bottle found on the kitchen counter; and a wine glass found on the living-room floor. These and other items taken from the apartment were tested for fingerprints, but no identifiable prints were found. The following evidence was sent to the Rhode Island Department of Health Biology Laboratory for DNA testing and analysis: two swabs from the large kitchen knife; two swabs from the small kitchen knife; defendant's polo shirt, T-shirt, jeans, socks, and boots; two oral buccal swabs from defendant; and a blood sample of decedent taken from the autopsy test.

Alexander Chirkov, M.D., an assistant medical examiner for the State of Rhode Island, conducted an autopsy on Hilario. Doctor Chirkov testified to finding forty stab wounds on Hilario's body, each having been inflicted with a sharp-bladed instrument. Specifically, during the examination Dr. Chirkov discovered the following: a four-inch deep stab wound[17] to the right

15. Lopez–Sanchez stated that it was hard for him to understand his father because "[t]here is a language barrier between" them, as defendant speaks Spanish and Lopez–Sanchez speaks only broken Spanish; however, he testified that he did his best "to make out everything [his father] was saying." Lopez–Sanchez explained that, although he had lived in New York apart from defendant, he and defendant had maintained a relationship and spoke on the telephone "[a]lmost on a daily basis," and that the language barrier between them had never prevented him from enjoying a relationship with defendant.

16. At this point, Officer Comerford was accompanied by Sergeant Kaya and Lieutenant San Lucas.

17. Doctor Chirkov explained that a stab wound involves deep contact with a knife to the body, whereas cutting or incise wounds

ventricle of the heart; injury to the left lung, causing it to collapse and resulting in internal bleeding in the left pleural cavity; a two-inch stab wound to the liver; stab wounds to the abdominal and chest areas, with internal bleeding in the abdominal cavity; and multiple stab and incise wounds to the hands and arms. Doctor Chirkov testified that the injuries to Hilario's hands and arms were defensive in nature, such as would be suffered by a person in an attempt to protect herself. He further stated that such injuries would have been painful and that Hilario consciously would have been aware of such pain. Moreover, Dr. Chirkov indicated that these defensive wounds were consistent with and corresponded to the serrated knife seized from the bathroom of Hilario's apartment. Ultimately, Dr. Chirkov determined that "[t]he cause of death [was a] stab wound to the * * * torso, and [the] manner of death [was] homicide."

■ On October 1, 2008, the jury returned a verdict of guilty of murder in the first degree, and after further instructions and argument, it found that the murder involved torture and aggravated battery. On January 16, 2009, the trial justice sentenced defendant to life without parole. On January 20, 2009, defendant filed a notice of appeal, and on May 14, 2009, a final judgment of conviction and commitment was entered.[18] Thereafter, this Court granted defendant's motion to hold

his appeal in abeyance pending the United States Supreme Court's decision in *Bullcoming v. New Mexico*, —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), and we also subsequently granted defendant's motion for leave to file supplemental briefs once the *Bullcoming* decision was issued.

We will address the issues raised on appeal *seriatim*.

## II

## Discussion

### A

#### The DNA Evidence

Cara Lupino, a senior forensic scientist at the Rhode Island Department of Health Forensic Biology Laboratory, testified at trial to receiving the evidence sent to the laboratory for DNA analysis.[19] Lupino detailed the general procedures and protocols for receiving evidence from the police and for preserving, marking, and testing such evidence. She indicated that, because of a large backlog, the Rhode Island laboratory had a contract with Orchid Cellmark (Cellmark) of Dallas, Texas, to perform some of its testing. Lupino indicated that she examined the swabs in this case for red- or brown-colored stains, and when she observed one, she tested it for the indication of blood, using her chemical screening test. After confirming the presence of blood,[20] she repackaged the evidence separately and then she sent such evidence to Cellmark.[21]

---

involve bleeding after a knife cuts the surface of the body.

18. This Court deems defendant's notice of appeal timely despite the fact that it was filed prior to entry of judgment. *State v. Vargas*, 21 A.3d 347, 352 n. 9 (R.I.2011).

19. As mentioned *supra*, the evidence consisted of: two swabs from the large kitchen knife; two swabs from the small kitchen knife; defendant's polo shirt, T-shirt, jeans, socks, and boots; two oral buccal swabs from defendant;

and a blood sample of decedent from the autopsy test.

20. Lupino indicated that the small kitchen knife swabs did not appear to have red- or brown-colored stains and, therefore, simply were repackaged in their original packaging material.

21. Specifically, Lupino testified to sending two of the three confirmed blood stains on defendant's shirt and jeans to Cellmark.

Matthew Quartaro, a supervisor at Cellmark, testified as an expert witness on behalf of the state regarding the results of the DNA testing. Quartaro testified, over defendant's objections, that his duties as a supervisor at Cellmark entail overseeing the work of a team of six DNA analysts and also performing the work of a DNA analyst himself. Quartaro explained that Cellmark is accredited by five different agencies and that each Cellmark analyst is required to partake in proficiency testing biannually.

Quartaro further explained that Cellmark's accrediting agencies establish and delineate the protocols and procedures for DNA testing. Quartaro indicated that these protocols and procedures are "widely accepted in the forensic biology community." Quartaro described the process as follows:

"The first thing we do is * * * receive evidence, usually it's either hand delivered or it is delivered by Federal Express or UPS or any sort of courier like that who has a tracking number so we can track the evidence from point A to point B. That evidence is then received by our evidence technician. It is logged into our computer system, it is given a case number.

"When an analyst is ready to look at this evidence, they will check it out of the evidence room, describe all of the layers of packaging, describe the evidence and then take cuttings or portions of this evidence to take forward to DNA analysis."

After these preliminary steps are completed, the first step of the DNA-profiling process is called "extraction." Extraction entails separating out the DNA needed for testing from the rest, a process somewhat like "separat[ing] an egg yolk from the [egg] white." After the extraction phase is completed, the extracted DNA is quantified so that a certain amount of DNA can be used in the "actual PCR [polymerase chain reaction] reaction." PCR testing involves taking a small amount of the extracted DNA and making copies of specific DNA regions so that comparisons can be made. Once the PCR testing is complete, the resulting DNA is "put on an instrument that will separate out the DNA by size." That data then is analyzed on the computer to create what is known as a "DNA profile." A DNA profile is obtained from amplifying thirteen different regions of a DNA strand. Once the DNA profile is generated from the computer program, that DNA profile is compared with a reference sample,[22] which consists of DNA from a known source. Finally, the DNA profiles from the evidence are compared with the reference samples to determine whether they may be included or excluded "as possible donors of the DNA that [was found] at the crime scene."

Quartaro indicated that it is not typical for one person to perform each step of the process, from cutting, to extraction, to quantification, to PCR testing, to finally generating a DNA profile. Instead, Cellmark uses a "team format," with different analysts performing each step.[23] In this case, Quartaro testified that he did not personally observe the analysts who conducted the cutting, extraction, or quantification, nor did he perform those steps. In fact, Quartaro indicated that he never physically touched the evidence in this

---

22. A reference sample is a known-DNA sample of an individual, which may come in the form of a buccal swab, liquid blood in a vial, or blood dried on special filter paper.

23. The analysts were also aided in many of the stages by robots and other automated processes because, as Quartaro explained, "it cuts down any chance of possible contamination."

case. Despite this, he testified that he had been "involved in the entire process" by other means. Specifically, Quartaro explained that he "evaluate[d] all the profiles, ma[d]e sure that * * * the best possible profile[s] [were obtained] from the evidence[,] * * * compared all the profiles, drew conclusions on those, calculate[d] statistics, [and] prepared [a] report." The only portion of Quartaro's report admitted into evidence was an allele table, which presented the numerical-DNA profile of each of the seven samples tested. Quartaro testified that he prepared this chart based on his analysis of computer-generated graphs,[24] which consisted of "raw data" obtained from the PCR-testing stage. Quartaro's report and conclusions then were reviewed by another analyst at Cellmark, Kelli Byrd.[25]

Quartaro then reported the following results based on a reasonable degree of scientific certainty: the DNA extracted from the kitchen knife swab and the white fabric swab of defendant's shirt matched the DNA profile of Hilario; the DNA extracted from the multicolored fabric swab of defendant's shirt revealed a mixed DNA profile, consistent with Hilario and defendant; the DNA extracted from the first denim swab revealed Hilario as the predominant DNA profile, however, the minor profile contributor was inconclusive; and the DNA extracted from the second denim swab showed Hilario as the predominant

DNA profile and the second profile was concluded to have "originated from at least one unknown individual." Quartaro further testified that he determined the probability of another individual matching the profiles found on the knife swab, the white fabric swab, or the predominant profiles found on the denim swabs to be one in 11.42 quadrillion. As for the mixed profiles found on the multicolored fabric, Quartaro determined that the probability of finding another individual to be a possible contributor to the mixture was "roughly" one in 130,000.

## B

### Confrontation Clause

■ The defendant contends that "his rights to confrontation under the Sixth Amendment to the United States Constitution and [a]rticle [1], [s]ec[tion] 10 of the Rhode Island Constitution were violated by the admission of testimony from [Quartaro] as to the results of DNA analysis performed by others." This Court engages in a *de novo* review of "questions of law and mixed questions of law and fact involving constitutional issues * * *." *State v. Rodriguez,* 917 A.2d 409, 413 (R.I. 2007) (quoting *State v. Snell,* 892 A.2d 108, 115 (R.I.2006)). Accordingly, this Court will review *de novo* the constitutional question of whether the admission of Quarta-

---

24. Quartaro testified that Cellmark uses software known as "Gene Mapper" to analyze DNA data. He indicated that Gene Mapper generates a series of graphs, which then are analyzed. He described the analysis as looking at a "series of peaks" to determine their size by using another software program. Quartaro explained that once the peak's size is quantified and the fragment of the DNA is identified, "the combination of all those pieced together is the DNA profile," which ultimately makes up the allele table.

25. On cross-examination, Quartaro indicated that there is no process whereby an analyst's work is reviewed directly, as "[t]here is no one that stands and watches each person work." Instead, an analyst's work is evaluated by reviewing their notes, conclusions, and data. Quartaro explained that he is confident that protocols were followed in every stage of the DNA testing and analysis in this case because he performed a review of all the work done and because "competent, qualified analysts," whom Quartaro helped train, performed the testing.

ro's testimony violated defendant's Sixth Amendment right of confrontation.

■ The Sixth Amendment's Confrontation Clause confers upon the accused the right "[i]n all criminal prosecutions, * * * to be confronted with the witnesses against him." This clause is interpreted as permitting the admission of "[t]estimonial statements of witnesses absent from trial * * * only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Although the United States Supreme Court has not definitively or exhaustively articulated the definition of a testimonial statement,[26] it recently has indicated that a document created primarily or "solely for an 'evidentiary purpose,' * * * made in aid of a police investigation, ranks as testimonial." *Bullcoming*, 131 S.Ct. at 2717 (quoting *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 2532, 174 L.Ed.2d 314 (2009)); *see also id.* at 2720 (Sotomayor, J., concurring) ("To determine if a statement is testimonial, we must decide whether it has 'a primary purpose of creating an out-of-court substitute for trial testimony.'" (quoting *Michigan v. Bryant*, —— U.S. ——, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011))). Further, the Supreme Court has made clear that the Confrontation Clause's dictates are as equally applicable to forensic evidence as to any other form of evidence. *See Bullcoming*, 131 S.Ct. at 2713 ("*Melendez–Diaz*, relying on *Crawford's* rationale, refused to create a 'forensic evidence' exception to this rule."); *Melendez–Diaz*, 129 S.Ct. at 2536 (stating that "[f]orensic evidence is not uniquely immune from the risk of manipulation" and "[c]onfrontation is one means of assuring accurate forensic analysis").

### 1

### Quartaro's Testimony

■ The defendant argues that his Sixth Amendment rights were violated because he was not given the opportunity to confront all the witnesses against him. To support this argument, defendant likens his case to *Bullcoming* and asserts that

---

**26.** In *Crawford v. Washington*, 541 U.S. 36, 52, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court extrapolated on the meaning of "testimonial" by listing various definitions of the term—including "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial"—but refused to make a "precise articulation" of the term. (Internal quotation marks omitted.) Later, in *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Supreme Court again avoided "attempting to produce an exhaustive classification of all conceivable [testimonial] statements," but it made the following proclamation:

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

In *Michigan v. Bryant*, —— U.S. ——, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011), the Supreme Court again attempted to clarify the meaning of "testimonial" in the context of *Davis* by stating:

"[T]here may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause."

cross-examination of Quartaro, a mere "surrogate witness," was an insufficient substitute for his right to confront all the intervening analysts who performed the preliminary stages of the DNA testing. In so doing, defendant points to the fact that Quartaro "never touched the evidence, never performed any part of any of the testing, and was not present or observing when the tests were performed" to reach his conclusion that the "[c]ross-examination of * * * Quartaro was not an adequate substitute for proper confrontation of the actual testers" because he "was incapable of ferreting out any fraudulent or faulty work in the extraction and measurement of the DNA in this case." Ultimately, defendant contends that *Bullcoming* controls the outcome of this case and mandates reversal."

We conclude, however, that defendant's emphasis on *Bullcoming* is unwarranted; rather, we find there are significant differences between the two cases. Here, Quartaro did not act as a surrogate witness similar to the testifying witness in *Bullcoming*. In *Bullcoming*, 131 S.Ct. at 2709, the testifying witness had no connection to the scientific report about which he testified aside from having familiarity with the testing laboratory's procedures.

"[*Bullcoming* ] is not a case in which the person testifying [was] a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue. [The surrogate witness] conceded on cross-examination that he [had] played no role in producing the * * * report and [had] not observe[d] any portion of * * * the testing." *Id.* at 2722 (Sotomayor, J., concurring).

The same is not true of this case. To the contrary, Quartaro was integrally involved in the entire process of DNA testing, analysis, and certification, and he formulated the allele table and provided expert testimony at trial concerning the conclusions. he drew therefrom.

Acting as a supervisor at Cellmark, Quartaro directed specific analysts to perform each stage of the DNA testing on each of the seven samples. After the first three stages of the DNA testing were completed, he then reviewed the entire case file and confirmed that all protocols were followed properly by examining the other analysts' notes, their affirmations that protocols were followed, as well as their conclusions. Most importantly, Quartaro personally reviewed and independently analyzed all the raw data, formulated the allele table, and then articulated his own final conclusions concerning the DNA profiles and their corresponding matches. Those final conclusions are the very statements—the statements of Quartaro—at issue in this case.

The DNA profiles and profile matches that Quartaro testified to at trial were his own independent, scientific opinions. Quartaro personally evaluated the DNA profiles to determine whether the samples contained the DNA of one or more people and then determined whether those profiles matched that of one of the known samples (either from defendant or decedent). Further, once a match was so determined, Quartaro ascribed the necessary statistical significance to that match, as only an expert may do. *See Commonwealth v. Barbosa,* 457 Mass. 773, 933 N.E.2d 93, 109 (2010) ("Only an expert can testify to the likelihood that more than one person possesses a particular DNA profile, based on her knowledge of the alleles selected for the DNA profile and the mathematical probabilities that more than one person may possess the same characteristics of those alleles."). Contrary to defendant's assertion, evidence that Hilario's DNA matched that of the blood found on defendant's clothing had

little probative value without Quartaro's expert testimony—"[e]vidence of a match based on currently used testing processes is meaningless without evidence indicating the significance of the match." *Id.* at 109 (quoting *Commonwealth v. Lanigan*, 419 Mass. 15, 641 N.E.2d 1342, 1346 (1994)).[27]

Consequently, Quartaro was the preeminent testifying witness. He testified as to his own conclusions; he did not act as a conduit of the opinions of, or parrot the data produced by, other analysts.[28] *Cf. United States v. Ramos–Gonzalez*, 664 F.3d 1, 5 (1st Cir.2011) ("Where an expert witness employs her training and experience to forge an independent conclusion, albeit on the basis of inadmissible evidence, the likelihood of a Sixth Amendment infraction is minimal. * * * Where an expert acts merely as a well-credentialed conduit for testimonial hearsay, however, the cases hold that her testimony violates a criminal defendant's right to confrontation."); *Commonwealth v. Munoz*, 461 Mass. 126, 958 N.E.2d 1167, 1174 (2011) (holding that admission of the testimony of "[a] substitute analyst who offers an independent opinion" does not violate the Confrontation Clause; however, "a substitute analyst cannot testify to, or otherwise introduce, the original analyst's reports and conclusions on direct examination"). Quartaro, as the author of the DNA profiles at issue, was the very witness that the Supreme Court deemed necessary in *Bullcoming:* "the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" *Bullcoming*, 131 S.Ct. at 2715 (quoting *Melendez–Diaz*, 129 S.Ct. at 2537 n. 6); *see also United States v. Moore*, 651 F.3d 30, 71 (D.C.Cir.2011) (holding that because a witness testified that he authored the reports at issue and was available for cross-examination at trial, the admittance of those reports "present[ed] no Confrontation Clause problem under *Bullcoming*"); *United States v. Boyd*, 686 F.Supp.2d 382, 385 (S.D.N.Y. 2010), *aff'd* 401 Fed.Appx. 565 (2d Cir. 2010) ("Only the final stage of the DNA testing involved the type of analytical judgment for which a certificate would be an inadequate substitute for in-court testimony under the Sixth Amendment.").

As the certifying witness in this case, Quartaro was the witness against defendant—the witness that defendant had the right to confront. *Bullcoming*, 131 S.Ct. at 2710 ("The accused's right is to be confronted with the analyst who made the certification * * *."). The defendant assuredly was given this right through the extensive and forceful cross-examination of Quartaro at trial. The defendant claims

---

**27.** The defendant states that Quartaro merely "offered an 'opinion' that the numbers in 'Column A' were the same as the numbers in 'Column B[,]' * * * which any juror could easily have determined for him- or herself." This mischaracterizes the extent of the analysis employed by Quartaro. As explained above, Quartaro developed the DNA profiles that he then matched. Further, Quartaro's testimony did not conclude with him merely identifying a match; rather, he testified about the precise probability of another individual matching that same DNA profile. This analysis assuredly could not have been conducted by the jury on its own.

**28.** Our determination is further buttressed by the recent decision of *Williams v. Illinois*, —— U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), in which a plurality of the United States Supreme Court held that an independent DNA expert—who had no connection to the testing laboratory or knowledge of its procedures, and who took no part in the DNA testing nor in the formulation of the DNA report—was permitted to testify concerning the substance of the DNA report. *See id.* at 2227–28, 2229–31, 2235, 2239–40.

that cross-examination of Quartaro was constitutionally inadequate because it "was incapable of ferreting out any fraudulent or faulty work in the extraction and measurement of the DNA in this case." We disagree.

In *Bullcoming*, 131 S.Ct. at 2715, the Supreme Court indicated that the surrogate witness's testimony was insufficient because the witness "could not convey what [the certifying witness] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed." Here, Quartaro could and did testify about the precise process employed for DNA testing in his laboratory because he had acted as a supervisor at Cellmark for three years and had performed each step in the DNA-testing process "thousands of times" while at Cellmark. Quartaro also testified to his familiarity with each testing analyst. *Cf. Bullcoming*, 131 S.Ct. at 2715–16 (noting the significance in the testifying witness's lack of knowledge of the reason the certifying witness was placed on unpaid leave); *Ramos–Gonzalez*, 664 F.3d at 6 (stating "significantly, as in *Bullcoming*, [the testifying witness] knew relatively little of the severity of [the certifying witness's] mental illness, or the extent to which it may have affected the quality of his work"). Quartaro indicated that he trained these analysts and that their competency routinely was confirmed through proficiency testing. Additionally, although he did not observe their execution of the testing, Quartaro testified that he personally was satisfied that protocols were followed after examining their case notes and the data collected. Further, Quartaro testified to the various safeguards Cellmark employed to protect against the risk of errors and to detect any such errors, if made. Accordingly, Quartaro could have been meaningfully cross-examined on the general and specific risks of error in forensic testing,

whether the result of carelessness, incompetence, or fraud. *See Boyd*, 686 F.Supp.2d at 385 (finding no constitutional violation when only the DNA analyst who wrote the report, and not the intervening-testing analysts, testified because "the testifying expert was himself familiar with the[ ] intervening procedures and could be fully cross-examined as to their efficacy, accuracy, etc."); *Munoz*, 958 N.E.2d at 1174 (holding that an expert who offers an independent opinion based on another analyst's report can be meaningfully cross-examined "on the general risk of error in forensic testing").

Moreover, Quartaro certainly could have been confronted about the risk that his own identifications of the DNA matches in this case were erroneous. *See Munoz*, 958 N.E.2d at 1175 ("[A] substitute analyst, basing an independent opinion on data generated by a prior analyst, can be cross-examined on many of the specific risks that could lead to an erroneous conclusion concerning the identity and weight of a substance at issue in a particular case."). Quartaro testified as to the process he employed to evaluate the data to reach the conclusion that Hilario's DNA was recovered from defendant's clothing. This opinion readily was testable on cross-examination. *See United States v. Summers*, 666 F.3d 192, 201–02 (4th Cir.2011) ("On the witness stand, [the expert] painstakingly explained the process whereby he, and he alone, evaluated the data to reach the conclusion that, to a reasonable degree of scientific certainty, [the defendant] was the major contributor of the DNA recovered * * *[.] [The expert's] opinion was an 'original product' that could be (and was) readily 'tested through cross-examination.'" (quoting *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir.2009))). Indeed, Quartaro's opinion was repeatedly challenged on cross-examination. *See State v.*

*Morel,* 676 A.2d 1347, 1356 (R.I.1996) (holding "that provided a defendant is afforded the opportunity to cross-examine the expert[ ], to question the validity of [his] conclusions, and to disclose the potential weaknesses of the proffered DNA analyses, the results of such analyses may be presented to the jury").

That is not to say that cross-examination of Quartaro could have addressed every risk of bias or error in the forensic testing. It is true that all stages of DNA testing and analysis are susceptible to error and falsification, and that a defendant must be given a reasonable opportunity to reveal any such errors or falsifications through cross-examination. *See Melendez–Diaz,* 129 S.Ct. at 2536 (stating that "[c]onfrontation is one means of assuring accurate forensic analysis"). However, it is equally clear that such an opportunity is not boundless. The Supreme Court made it clear that the Confrontation Clause does not mandate "that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Id.* at 2532 n. 1. Therefore, the fact that Quartaro used data produced from the work of other analysts to form his final, independent conclusions did not bestow upon defendant the constitutional right to confront each and every one of those subordinate analysts. *See id.* (noting that the prosecution is not required to call every person "who laid hands on the evidence"); *see also Munoz,* 958 N.E.2d at 1176 ("[T]he Constitution has not yet been construed to require the testimony of every person who might conceivably have compromised the reliability of the evidence introduced against a defendant.").

 Instead, "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility."

*Melendez–Diaz,* 129 S.Ct. at 2532 n. 1 (quoting *United States v. Lott,* 854 F.2d 244, 250 (7th Cir.1988)); *see also State v. Nelson,* 982 A.2d 602, 612 (R.I.2009) (holding that proof of a continuous chain of custody is relevant only as to the weight, and not the admissibility, of the evidence). As a result, questions as to how prior analysts' handling or preparation of the DNA samples may have affected Quartaro's independent, scientific opinions are evidentiary, and not of a constitutional dimension. *See Vann v. State,* 229 P.3d 197, 210–11 (Alaska Ct.App.2010) (stating that "there is always the possibility that * * * the sample was misidentified or contaminated or improperly prepared for testing," but that those issues involve evidentiary questions of authentication, weight, and credibility).

Accordingly, we hold that in this case, where defendant had ample opportunity to confront Quartaro—the witness who undertook the critical stage of the DNA analysis, supervised over and had personal knowledge of the protocols and process of all stages involved in the DNA testing, reviewed the notes and data produced by all previous analysts, and testified to the controls employed by the testing lab to safeguard against the possibility of testing errors—the Confrontation Clause was satisfied.

**2**

**The Allele Table**

The admission of the allele table, the only part of Quartaro's report introduced into evidence, requires a more nuanced analysis. *See Summers,* 666 F.3d at 202 ("[T]he report invited the jurors' attention to the data's numerical identifiers. Admission of the report presented an unnecessary risk that the jury would improperly evaluate the DNA evidence based on its

lay perceptions of what the data meant rather than on [the witness's] expertise and any potential inaccuracies in his conclusions that might be developed on cross-examination."). The allele table articulated by numerical identifiers the DNA profiles of defendant and decedent, as well as that of the bloodstains found on evidence seized from the scene of the crime. These "statements" clearly constituted solemn declarations made for the primary purpose of establishing facts relevant to a criminal prosecution. *Bullcoming*, 131 S.Ct. at 2716 (holding that statements were testimonial in nature because they "were 'incontrovertibly * * * affirmation[s] made for the purpose of establishing or proving some fact' in a criminal proceeding" (quoting *Melendez–Diaz*, 129 S.Ct. at 2532)). The DNA testing was performed to aid the criminal prosecution of defendant for the first-degree murder of Hilario. The DNA-profiling analysis was completed for the sole purpose of proving at trial that Hilario's blood was on defendant's hands, so-to-speak. Quartaro generated the allele table for only one conceivable purpose—its later use at defendant's criminal trial to prove that defendant wore the DNA of Hilario on the night of her murder.

Despite reaching the ineluctable conclusion that the allele table was prepared for the sole purpose of aiding in defendant's criminal prosecution, we must further consider whether the allele table should be characterized as testimonial in nature or as mere machine-generated, nontestimonial raw data. This query stems, at least in part, from Justice Sotomayor's remark in *Bullcoming*, 131 S.Ct. at 2722 (Sotomayor, J., concurring), that the Supreme Court has not yet determined whether "raw data generated by a machine" could be introduced into evidence "in conjunction with the testimony of an expert witness." [29] Since Justice Sotomayor made such a reflection, at least two courts have squarely addressed this question in reference to tables composed of numerical DNA profiles similar to the allele table at issue in this case. *See United States v. Summers*, 666 F.3d 192 (4th Cir.2011); *Derr v. State*, 422 Md. 211, 29 A.3d 533 (2011).[30]

In *Summers*, 666 F.3d at 196, the testifying expert wrote a three-page report describing the DNA-testing results and his expert conclusions, which "contained a table juxtaposing the numerical identifiers of the allele found at corresponding loci of the DNA extracted * * *." Although author of the report and a supervisor in the testing laboratory, the testifying expert did not himself perform the DNA testing at issue. *Id.* The expert's complete report, including its corresponding allele table, was admitted into evidence. *Id.* In the face of the defendant's Confrontation Clause challenge, the Fourth Circuit found no error in the admission of the expert's testimony concerning the DNA-testing results, nor in his report's admission into evidence because of the predominance of the expert's "independent, subjective opin-

---

**29.** In *Bullcoming v. New Mexico*, —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the Supreme Court clearly was not presented with a situation involving "only machine-generated results," *id.* at 2722 (Sotomayor, J., concurring), because the admitted report contained statements by the analyst about the procedures involved in the testing, which the Supreme Court noted clearly amounted to "representations[ ] relating to past events and human actions not revealed in raw, machine-produced data." *Id.* at 2714.

**30.** As a point of clarification, this Court construes the "numerical identifiers of the DNA allele" in *United States v. Summers*, 666 F.3d 192, 203 (4th Cir.2011), and the "DNA profile" in *Derr v. State*, 422 Md. 211, 29 A.3d 533, 537, 541 (2011), as referencing what we characterize as an "allele table" in this opinion.

ion and judgment" therein. *Id.* at 201, 202. However, the admission of the allele table, which the court construed as representing the "testing results" of subordinate analysts not available for cross-examination, gave the court "pause." *Id.* at 202. Nevertheless, the court determined, in accordance with its circuit precedent,[31] that "[t]he numerical identifiers of the DNA allele here, insofar as they are nothing more than raw data produced by a machine," could not be considered testimonial in nature. *Id.*

In so holding, the Fourth Circuit drew a direct comparison to *Derr,* 29 A.3d at 550, 553, 554, which held that the allele table in that case was testimonial and could not be construed as entirely machine-generated raw data. After synthesizing *Derr's* handling of this issue, the *Summers* court concluded that "[t]o the extent that *Derr* ascribes testimonial significance to machine-generated results—a conclusion that cannot be squared with our own circuit precedent—we find its reasoning unpersuasive." *Summers,* 666 F.3d at 203. The court in *Derr,* however, did not characterize the allele table in question as wholly machine-generated. Instead, the court provided a painstakingly detailed analysis of just how elaborate the process of preparing an allele table and creating a DNA profile is: The process involves a specialized DNA analyst interpreting data displayed in the form of a graph containing different-colored peaks of varying heights to identify the values of alleles at each chromosomal location.[32] *Derr,* 29 A.3d at 541–42. Thus, the process entails a DNA analyst transforming raw data, in the form of computer-generated graphs, into an allele table exhibiting the DNA profiles of the tested samples.

■■ The process described in *Derr* is similar to the process that Quartaro testified he undertook in this case to produce the contested allele table. Quartaro's tes-

---

**31.** In *United States v. Washington,* 498 F.3d 225, 230, 231, 232 (4th Cir.2007), the Fourth Circuit determined that machine-generated printouts from a gas chromatograph machine could not be considered testimonial hearsay statements.

**32.** Specifically, the court elucidated:

"It is important to explain what a DNA profile is composed of, and how it is created. * * * [T]he DNA is heated to separate the nucleotides. The chemical in which the DNA is heated contains markers that identify 'the starting and ending points of the DNA fragment that is duplicated.' * * *. After the DNA fragments are copied, the fragments are sorted according to length in a process called electrophoresis. * * * Special software measures the length of the varying DNA fragments. * * * This process produces 'an electropherogram, or graph that displays a series of different-colored peaks of different heights.' * * * The electropherogram reveals the primers used during amplification which contain fluorescent markers. 'The machine and the software then represent the lengths of the various fragments as peaks on a graph.['] * * * Specifically:

"[S]oftware has two components, GeneScan® and Genotyper®. Data viewed in GeneScan® * * * is the raw, unanalyzed, collection data that reflects everything the laser detects, including interference that is common in electrophoresis instruments (Gene[S]can® data). Genotyper® allows forensic scientists to take GeneScan® data and display it in a format that conceals background noise and peripheral information, and to focus their review on the results of the control and evidence samples.

" * * * *A DNA analyst, or examiner, interprets the data displayed on the electropherogram, which reveals the alleles seen at all the examined loci. * * * The DNA examiner then works with the Genotyper graph and documents the allele values at each chromosomal location or loci, forming the DNA profile. * * * This DNA profile is then* compared to profiles from known individuals * * *." *Derr,* 29 A.3d at 541 (emphasis added).

timony, both on direct and on cross-examination, reveals that the allele table he prepared was the result of his own independent analysis of the raw data produced in graph form by the computer program known as "Gene Mapper." Quartaro analyzed these graphs to identify the genetic profiles contained in the DNA samples and then compiled this information into the allele table. Although aided by computer software in so compiling, Quartaro was required to assess the results to ensure that "the best possible profile" was gleaned from the data. In so doing, Quartaro independently chose to consider only some of the generated profiles in forming the allele table. Accordingly, we are convinced that the certifications made in the allele table—*viz.*, that it represents the DNA profiles of defendant and decedent—are that of Quartaro, and that they may not be attributed fairly to Quartaro's subordinate analysts, nor to a machine.

We reach this conclusion upon our determination that crucial to the question of whether material consists of mere raw data is the exercise, or lack thereof, of independent, subjective analysis.[33] The significance of such critical thinking is apparent in the analysis of even those courts that have declared certain scientific-testing materials to be nontestimonial raw data. *See, e.g., Summers,* 666 F.3d at 203 (stating, after determining that the allele table was nontestimonial, machine-generated raw data, that "[t]he only evidence inter-

preting the raw data was provided by [the testifying expert] via his report and live testimony"); *United States v. Moon,* 512 F.3d 359, 362 (7th Cir.2008) (stating that "the Confrontation Clause does not forbid the use of raw data produced by scientific instruments, though the interpretation *of* those data may be testimonial"); *People v. Brown,* 13 N.Y.3d 332, 890 N.Y.S.2d 415, 918 N.E.2d 927, 931 (2009) (stating that a DNA report, consisting of "machine-generated graphs, charts and numerical data," was nontestimonial because "[t]here were no conclusions, interpretations or comparisons apparent in the report since the technicians' use of the typing machine would not have entailed any such subjective analysis"). We, unlike the courts in the aforementioned cases, cannot say that the allele table in this case was not the result of an individual's specialized and calculated interpretation and analysis. It is clear from Quartaro's testimony that he employed his scientific expertise and knowledge to independently scrutinize and analyze graphical raw data—the computer-generated byproduct of Quartaro's subordinate analysts' testing—and that such independent interpretation resulted in Quartaro transforming what was raw data into the testimonial materials at issue in this case. As a result, we conclude that the numerical identifiers in the allele table constituted testimonial statements that are subject to the dictates of the Confrontation Clause. *See Bullcoming,* 131 S.Ct. at 2713–14 ("An

33. We understand that this conclusion decidedly is distinct from *Derr's* definition of raw data as "limited to the data or materials which have not yet been subjected to scientific *testing." Derr,* 29 A.3d at 554 (emphasis added). We, however, do not agree that materials may be characterized as raw data only *before* any testing is performed. Such a characterization would lead to the unreasonable result in this case that raw data ceased to exist once testing began in the extraction phase—the very first stage of DNA testing.

Instead, we are of the mind that the subjective analysis involved in the DNA-profiling stage is the decisive point at which raw data inevitably is crafted and polished into what may be deemed testimonial material. As such, and with due respect, we do not endorse the Maryland court's apparent conclusion in *Derr,* 29 A.3d at 537, 549, 554, that all the analysts who performed any testing of the evidence were required to testify to satisfy the defendant's right to confrontation.

analyst's certification prepared in connection with a criminal investigation or prosecution * * * is 'testimonial,' and therefore within the compass of the Confrontation Clause.").

As we previously have explicated, however, the numerical identifiers in the allele table were the product solely of Quartaro's expertise and independent analysis of the graphical raw data. We thus are of the opinion that the requirements of the Confrontation Clause were satisfied by defendant's ample opportunity to cross-examine Quartaro.

## III

### Prior–Acts Evidence

In his second point of contention on appeal, defendant argues that the trial justice abused his discretion by admitting evidence of two prior instances of defendant's violent acts against Hilario. To support this argument, defendant maintains that the evidence of his prior acts of domestic violence against Hilario was "insufficiently relevant" and unnecessary to prove motive or intent to kill. Further, defendant argues that this evidence should have been excluded pursuant to Rule 403 of the Rhode Island Rules of Evidence "because its admission was improper, as unfairly prejudicial." Lastly, defendant maintains that, "even if some evidence of prior wrongs was admissible * * *, the state went much too far with its presentation in this case," which "itself [constitutes] prejudicial, reversible error."

After similar arguments were articulated by defendant at the pretrial hearing on his motion *in limine* to exclude such evidence, the trial justice ruled that evidence of defendant's two prior instances of violence against Hilario, both occurring in May 2007, were admissible. The trial justice concluded that the "two acts clearly go

to intent, and the probative value of this evidence far outweighs any prejudice to the defendant because it really does create a complete picture of the relationship between the parties, and the acts are so intertwined * * * that [such evidence] should be admitted." As a result, the state introduced evidence at trial about an event in early May 2007, when defendant pushed Hilario to the ground, an event that precipitated the breakup, as well as an incident occurring on May 18, 2007, two days before the murder, when defendant stabbed Hilario's mattress with a knife.

■ It is well settled that evidentiary determinations remain "within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of [that] discretion is apparent." *State v. Gaspar*, 982 A.2d 140, 147 (R.I.2009) (quoting *State v. Mohapatra*, 880 A.2d 802, 805 (R.I. 2005)). Applying this deferential standard, we are satisfied that the trial justice did not abuse his discretion in ruling that the prior-acts evidence was admissible for the purpose of proving defendant's intent.

■ Rule 404(b) of the Rhode Island Rules of Evidence provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

This language unequivocally prohibits the use of propensity evidence; that is, evidence "to prove the character of a person in order to show that the person acted in conformity therewith." Rule 404(b); *State*

*v. Rodriguez,* 996 A.2d 145, 150 (R.I.2010). However, the rule also makes clear that such evidence "is admissible to show a fact that tends to prove that the defendant is guilty of the crime charged." *Rodriguez,* 996 A.2d at 151 (quoting *State v. Parkhurst,* 706 A.2d 412, 424 (R.I.1998)). Further, "[e]vidence of other conduct, even of a criminal nature, may be received if it is interwoven with the current charge in a way that tends to establish 'guilty knowledge, intent, motive * * * or the like.' " *State v. Brown,* 900 A.2d 1155, 1161 (R.I. 2006) (quoting *State v. John,* 881 A.2d 920, 926 (R.I.2005)).

In this case, evidence of defendant's prior conduct was integrally related to the murder of Hilario on May 20, 2007. As an initial matter, both earlier events involved the same parties and occurred in the same place, within only weeks or days of the murder in question. Further, the May 18, 2007 incident during which defendant repeatedly stabbed decedent's mattress involved the same or similar instrumentality that eventually was used in the murder. These facts were carefully and properly weighed by the trial justice, which led him to conclude that the prior acts were "intertwined with what ultimately took place on [May 20, 2007]."

Each event precipitated the next and culminated in the gruesome murder of Hilario. The incident of violence in early May resulted in Hilario ending her relationship with defendant, which infuriated defendant and escalated into the May 18, 2007 incident. At that time, defendant harassed Hilario and stabbed her mattress numerous times. This violent outburst was followed, only days later, by the vicious stabbing murder of Hilario.

The extent that these prior acts are interwoven reflects directly upon, and is highly probative of, defendant's motive and intent to murder Hilario. "Evidence of a prior threat made by a defendant is relevant to the question of whether the defendant 'acted with malice or premeditation, or whether he had a motive to commit the crime.' " *State v. Pule,* 453 A.2d 1095, 1098 (R.I.1982) (quoting 1 Wharton, *Criminal Evidence* § 201 at 414–15 (13th ed.1972)); *see also State v. Rios,* 996 A.2d 635, 639 (R.I.2010) (holding that the defendant's "previous threatening behavior" toward the victim "was highly probative of his motive"). Contrary to defendant's contention, this evidence's high probative value clearly outweighed any potential for unfair prejudice.[34] "[I]t is only when evidence is marginally relevant and enormously prejudicial that a trial justice must exclude it." *State v. Mlyniec,* 15 A.3d 983, 997 (R.I.2011) (quoting *State v. DeJesus,* 947 A.2d 873, 883 (R.I.2008)). Therefore, we find no error in the trial justice's decision to allow admission of this evidence.

Moreover, we recognize that the trial justice carefully weighed the risk of unfair prejudice and took affirmative efforts to ensure that the testimony offered was not unfairly prejudicial. First, he barred the introduction of evidence of a more remote incident of violence against Hilario, fearing that admitting such evidence would extend Rule 404(b) too far and create an unnecessary and substantial risk of unfair prejudice against defendant. *See Mlyniec,* 15 A.3d at 998 (holding that admittance of prior-acts evidence was not unfairly prejudicial after "observ[ing] that in an effort to ensure that the testimony was

---

**34.** Rule 403 of the Rhode Island Rules of Evidence provides for the exclusion of relevant evidence only when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

not unfairly prejudicial, the trial justice carefully excluded the testimony" because of "its remoteness and its potential to be cumulative"). Additionally, the trial justice further safeguarded against the risk of unfair prejudice by issuing an appropriate limiting instruction to the jury.[35] Consequently, we discern no clear abuse of discretion in the introduction of the evidence of defendant's two prior acts of violence against Hilario.

## IV

### Jury Instruction on Prior Inconsistent Statements

The defendant also argues that the trial justice's jury instruction concerning prior inconsistent statements was "legally deficient" because "[h]e failed to instruct the jury, as requested, that a witness'[s] credibility may be impeached by the fact that he or she made inconsistent statements." This failure, according to defendant, was "highly prejudicial" because the trial justice's instruction did not adequately inform the jury that it was entitled to reject a witness's testimony in its entirety as a result of a prior inconsistent statement. Instead, defendant suggests that the instruction implied that the jury was merely restricted to decide "which version of the witnesses' testimony" to credit.

"We undergo a review of jury instructions on a *de novo* basis." *State v. Cipriano*, 21 A.3d 408, 423 (R.I.2011) (quoting *State v. Ros*, 973 A.2d 1148, 1166 (R.I.2009)). We review "[jury] instruc-

tions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them," *id.* (quoting *Ros*, 973 A.2d at 1166), and we will affirm if "the instructions adequately cover the law and neither reduce nor shift the state's burden of proof." *Id.* (quoting *State v. Linde*, 876 A.2d 1115, 1128 (R.I.2005)). Further, "a 'trial justice's refusal to grant a request for jury instruction is not reversible error if the requested charge is fairly covered in the general charge.'" *Id.* (quoting *State v. Price*, 706 A.2d 929, 934 (R.I.1998)).

The defendant asserts error in the trial justice's following jury instruction concerning the credibility of witnesses:

"You may consider the presence of corroborating or contradictory evidence as well as any consistencies or inconsistencies between what was testified to by a witness during the trial and what that witness may have said at an earlier time. A witness'[s] prior statements may be accorded whatever evidentiary weight you feel they deserve."

At trial, defense counsel objected to this instruction, arguing that it improperly "restricted the use that the jurors can make of a prior inconsistent statement." This objection was made in light of the fact that defense counsel had proposed the following instruction: "[a] witness'[s] testimony at trial may be impeached or discredited by the admission into evidence of prior statements made by the witness which are inconsistent with his or her trial

---

**35.** The trial justice issued the following instruction:

"To the extent that there was testimony that on other occasions, the defendant engaged in other untoward conduct, bear in mind that he's not been charged with any such untoward conduct or alleged misconduct and you may not draw the inference that the defendant committed the criminal

offense he's on trial for simply because on other occasions, he may have acted improperly. To the extent that you decide to consider this evidence, it is admitted for your consideration for the limited purpose as it may relate to the defendant's motive, intent or plan with regard to the offense for which he is presently on trial. You may not consider this evidence for any other purpose."

testimony." [36] In response, the trial justice explained that he was satisfied with his instruction because "read * * * in its entirety, [it provides the jurors] the ability to either accept or reject in whole or in part[,] * * * telling them that they can clearly discredit [a witness's testimony] if they want to."

 We similarly perceive no error in this instruction. It is well settled that this Court reviews jury instructions in their entirety. *State v. Lynch,* 19 A.3d 51, 58 (R.I.2011). We "will not examine a single sentence apart from the rest of the instructions[;] * * * rather[,] the challenged portion[ ] must be examined in the context in which [it was] rendered." *State v. Adefusika,* 989 A.2d 467, 475 (R.I.2010) (quoting *State v. Kittell,* 847 A.2d 845, 849 (R.I.2004)). Thus, this Court will not detach the trial justice's instruction that "[a] witness'[s] prior statements may be accorded whatever evidentiary weight you feel they deserve" from its context.

 An examination of this context reveals the adequacy of the trial justice's instructions. The trial justice followed his challenged instruction regarding prior inconsistent statements with a directive to the jury that it was the sole arbiter of the credibility of witnesses, stating: "You are the sole judges of the facts and credibility of the witnesses and of the weight which you will give the testimony of each witness. After making your own judgment, give the testimony of each witness such weight, if any, as you think it deserves." This instruction explicitly informed the jury that it was entitled to give a witness's testimony no weight at all, if it so chose. Accordingly, the trial justice, though not using the precise words proffered by defendant, adequately instructed the jury about its

authority to discredit the testimony of a witness who had been impeached by a prior inconsistent statement. *See Adefusika,* 989 A.2d at 477 (holding that although the trial justice "did not adopt the specific language that defendant requested be used in instructing the jury[,] * * * the trial justice adequately and accurately instructed the jury as to that element of the charge"). Therefore, "[w]e perceive neither error nor prejudice to defendant in the trial justice's decision to decline defendant's request that the specific language that he preferred be included in the jury instructions." *Id.*

## V

### Life Sentence Without Parole

Lastly, defendant prays that this Court reduce his sentence to one of life imprisonment with the possibility of parole. In so doing, defendant emphasizes "the profusion of mitigating evidence," as well as the unusual "abundance and substance" of that evidence. The defendant specifically points to the fact that he is a first-time offender, "with a long background of dutiful and loving care to his family and friends; an exemplary history of employment and service to school children[;] * * * and * * * has demonstrated an amazing degree of personal caring and generosity toward those in need."

 This Court has statutory authority to review and reduce sentences of life without parole on direct appeal pursuant to G.L.1956 § 12–19.2–5, which states:

"The defendant shall have the right to appeal a sentence of life imprisonment without parole to the [S]upreme [C]ourt of the state in accordance with the appli-

---

**36.** The defendant's requested jury instructions are not produced in the lower court record. However, the requests are referred to in the trial transcript and have been produced as an exhibit in defendant's brief before this Court.

cable rules of [C]ourt. In considering an appeal of a sentence, the [C]ourt, after review of the transcript of the proceedings below, may, in its discretion, ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment."

It is well established that in cases where a sentence of life imprisonment without the possibility of parole has been imposed, this Court will exercise its independent judgment and discretion and conduct a *de novo* review of the appropriateness of the sentence. *Mlyniec*, 15 A.3d at 1000. "In so doing, this Court examines the total record, the jury's findings, the trial justice's conclusions, and reviews the personal character, record, and propensities of the defendant, including any aggravating circumstances as well as any mitigating factors." *Id.*; *see also State v. Graham*, 941 A.2d 848, 866 (R.I.2008) (listing the factors this Court considers when reviewing a life sentence without the possibility of parole).

The trial justice imposed the sentence of life without parole after a sentencing hearing, in accord with § 12–19.2–4.[37] At the sentencing hearing, the trial justice was presented with remarks from Hilario's daughter, sister, and nephew, all urging for the maximum sentence. Statements also were presented on behalf of defendant by two of his friends, a former colleague of defendant, defendant's sister, and one of his sons. The trial justice also heard arguments by counsel for both parties, listened to an allocution statement by defendant, read multiple letters submitted on behalf of defendant, and reviewed the presentence report. Thereafter, the trial justice thoughtfully explained his conclusion that defendant's crime merited the most extreme penalty allowed under Rhode Island law as follows:

"As I go through the various factors that the [c]ourt has to consider, certainly in looking at the severity of the crime, there's no question in my mind, you can't get much more severe than this. As pointed out by the [s]tate's attorney, while all murders are bad, this is not the scenario where there was one stab wound or one blow or one shot, but rather this was a continuous bludgeoning of this victim with a total of [forty] different stab wounds to her.

" * * *

"The [m]edical [e]xaminer, in his testimony, spoke to the severity of the injuries that were received, and he spoke about the fact that there w[ere] injuries to her hands and arm, multiple stab cuts and wounds. And he described these as incised cutting wounds, defense wounds. And then he went on to describe the wounds to her chest and her abdomen, and this being [forty] wounds, each with a sharp instrument, injuries to her left lung where there would be internal bleeding. The left lung was collapsed, stab to the heart, ventricle, practically lethal entry, one would die in minutes,

---

**37.** General Laws 1956 § 12–19.2–4 provides:
"At the presentence hearing, following a finding that one or more of the circumstances enumerated in § 11–23–2 or 11–23–2.1 as the basis for imposition of a sentence of life imprisonment without parole was involved in the first degree murder of which the defendant has been convicted, the court shall consider evidence regarding the nature and circumstances of the offense and the personal history, character, record, and propensities of the defendant which are relevant to the sentencing determination. After hearing evidence and argument regarding the aggravating and mitigating circumstances relating to the offense and the defendant, the court shall, in its discretion, sentence the defendant to life imprisonment without parole or to life imprisonment. The court shall state on the record its reasons for imposing its sentence."

stabbing to the liver and the perforation of the abdominal cavity.

"He went on to say that injuries to her hands and upper torso were painful. The skin of the hand has pain receptors. She was aware of this pain. The injury to the heart was four inches deep. He couldn't say which one of these would have been the ultimate fatal b[low], but his testimony to this [c]ourt indicates that clearly, while this process of [forty] stabs was going on, this woman was suffering. So, this [c]ourt clearly finds that with regard to the severity of the crime, it can't get any more severe.

" * * * [T]here's no way that one could reasonably conclude that the infliction of [forty] stab wounds is not beyond the ordinary, that this is the kind of conduct that exactly was being considered by the Legislature when enacting this particular legislation.

" * * *

"The next element that the [c]ourt has to consider is the potential for rehabilitation[.] * * * We have only to go on the statement that he made to the [p]robation [o]fficer when he gave his statement as part of the [p]resentence [r]eport. * * * [In that statement,] [h]e immediately accused the jury of not being fair towards him because of its makeup. But then he went on to say that, 'I don't know what happened. Everyone knows who killed her. Providence PD killed her.'

"This is a statement that comes from a person who, obviously, has a strong intellect, and yet he was trying to * * * present an argument or a suggestion to the [p]robation [o]fficer a theory as to what happened in this case, that is absolutely incredulous. And so I have to look at that and wonder whether or not this is a man who really has got the ability to be rehabilitated.

"The [c]ourt did have a chance during the course of the trial and preliminary thereto to look at the defendant as he lived at the ACI * * *. The defendant had indicated that he needed to have an opportunity to get a postponement because he had some medical problems * * *. During that hearing the [c]ourt had a chance to review the [twenty-four]-hour video that is on all prisoners at the ACI, * * * and I watched first-hand as I saw this gentleman behave in a manner that clearly indicated that there was nothing wrong with him. And as I saw it, it was an indication of his manipulative abilities. The same kind of abilities that I think he possesses in many of the things he's done throughout his life. And as I saw that video, and as I reviewed that [p]resentence [r]eport, I said, 'This is a person who is out to basically con the system.['] And I think that's the kind of character that he has. It's an ability to do some good things with his verbal abilities, but, on the other hand, it's the same kind of quality that causes him to do things that are not good. And that's a character flaw as I see it, and those are the kind of things that are never ever really rehabilitated. * * * And, frankly, because of that, this [c]ourt finds that this defendant is not a person who is capable of rehabilitation.

" * * * *

"I've thought about this defendant, and what I've heard from the various folks who have come to his support. I've read a lot of the letters that were written on his behalf more than once, and I tried to figure out what was going on. And I concluded, and this is from a lay person, that he suffers some kind of a character flaw. He uses some great qualities to ingratiate himself with people, but in his inner being his essential character is one of violence and one that

if he's in any way spurned by a woman, she can expect the most from him in the most violent way. And if you look back, that's exactly what we saw here.

"We heard the testimony during the trial. We heard from people today. He first met the decedent, she indicated that this was the man for her and everything was fine, he was wonderful. And then slowly, over the next year things began to change * * *. He became * * * a monster. * * * And it was this monster problem or character flaw that ultimately did him in. Because when she left him, when she spurned him, he [turned into a monster]. * * * That was a monster that he's able to control himself by his charming ways and his ability to express himself well and be active and helpful in his community, but at the same time it's what was dwelling within him. And when he was crossed by her, he could no longer control that monster. What we saw on [May 20, 2007] was the full emotion by that monster.

" * * * [T]he Supreme Court as well as the Legislature reserved this ultimate penalty only for the most aggravated or egregious fact patterns. I can't see any more aggravated or egregious. [Ultimately,] [t]his calculated, intended, premeditated murder was of such a character that it clearly falls within the guidance and edicts from our Legislature and our Supreme Court."

▬▬▬ After carefully considering all the evidence before us in this case, including the findings of the trial justice, the personal character, record, and propensities of defendant, and weighing the mitigating factors referenced by defendant, we agree with the thoughts expressed by the trial justice as quoted above. In reaching this conclusion, "we are mindful that this most extreme sentence should be reserved for a 'narrow class of the most heinous crimes.'" Mlyniec, 15 A.3d at 1003 (quoting State v. Brown, 898 A.2d 69, 86 (R.I. 2006)). However, considering the extreme brutality evident in this stabbing murder, as well as defendant's lack of remorse, we hold that the sentence of life imprisonment without the possibility of parole was appropriate.

This brutal slaying undoubtedly falls within the definition of aggravated battery.[38] See State v. McManus, 941 A.2d 222, 236 (R.I.2008) (stating that an aggravated battery finding requires "convey[ing] to a juror of ordinary intelligence an image of a beating or infliction of traumatic force that is greater than necessary in order to render a victim helpless or to subject the victim to the will of the aggressor" (quoting State v. Travis, 568 A.2d 316, 323 (R.I.1990))). The graphic photographs and autopsy results disclose that defendant viciously stabbed Hilario at least forty times while she fearfully and helplessly struggled to protect herself. Of the forty stab wounds, several wounds alone would have been fatal. Yet, the extensive injuries to Hilario's hands and upper extremities, including one stab wound to her arm that penetrated the skin on one side and exited on the other—all suffered in an effort to defend herself from defendant's savage attack—demonstrate that Hilario suffered a slow and painful death. Based on these gruesome details, we conclude that the

---

**38.** It should be noted that the jury found that the murder was committed in a manner involving both aggravated battery and torture; however, because we conclude that the record contains ample evidence supporting a finding of aggravated battery, we need not reach the issue of torture. See State v. McManus, 941 A.2d 222, 236 (R.I.2008) (concluding the issue of torture need not be reached when the record clearly supported the finding of aggravated battery).

evidence in this case overwhelmingly supports the trial justice's finding that defendant's crime was indeed a "most heinous" crime. *Brown*, 898 A.2d at 86; *cf. McManus*, 941 A.2d at 224–25, 226, 236 (upholding a sentence of life imprisonment without parole when, after years of physical and emotional abuse, the defendant killed his wife in front of their minor children by stabbing her six times while she was defenseless).

Additionally, there is nothing in the record indicating that defendant has shown any real remorse for what he has done. *See Mlyniec*, 15 A.3d at 1003 (weighing the defendant's "want of compunction" when reviewing his sentence of life imprisonment without parole). Instead, defendant has "refuse[d] to take responsibility for his grotesque actions and attempted to pass them off on someone else." *Brown*, 898 A.2d at 87. In fact, defendant made the most contemptible claim that the Providence Police Department was the real culprit in the bludgeoning death of Hilario. The loathsomeness of this allegation is magnified in light of the ample evidence of defendant's previous acts of domestic violence and ominous threats to Hilario's life. This appalling claim does more than demonstrate defendant's complete lack of remorse—it also reveals his troubling character. The sheer brutality and depravity of defendant's crime, his want of remorse, coupled with his troubling character and propensity for similar criminal conduct, reinforce our conclusion that it is unlikely that defendant could ever be rehabilitated.

It is his character and past good deeds that defendant asserts as mitigating circumstances, which he claims make the imposition of a life sentence without parole improper. Although this Court recognizes and has considered, as did the trial justice, defendant's past service to the community and benevolence to others, we are hard-pressed to find that these mitigating factors outweigh the numerous aggravating factors established in this case. As the trial justice aptly noted, quoting *State v. Tassone*, 749 A.2d 1112, 1120, 1121 (R.I.2000), "the true measure of this defendant's character and propensities is what he did to that victim," and "[t]hat was the act of a vile and despicable person." *Id.* (affirming a sentence of life without parole where the defendant had no prior criminal record and had a good reputation in the community). We agree with the trial justice's determination that, despite his attested to prior acts of kindness, defendant's "essential character is one of violence," and that his monstrous crime warrants the imposition of Rhode Island's most severe sentence.

Therefore, after carefully considering the evidence in the exercise of our independent judgment and discretion, we affirm the sentence imposed by the trial justice.

## VI

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

Justice INDEGLIA did not participate.

Justice FLAHERTY, dissenting.

I dissent only from that part of the majority's opinion that affirms the trial judge's imposition of a sentence of life without the possibility of parole. I acknowledge the difficult decision that the trial justice faced in this case as well as the thoughtful analysis that led him to the conclusion that the most serious sentence was appropriate for this defendant. I also acknowledge the well-reasoned opinion of the majority on all the issues in this case,

including the sentence imposed by the trial justice.

However, after undertaking a comprehensive and independent review of the entire record, as I am required to do by G.L.1956 § 12–19.2–5, and even though I agree with the majority that the murder of Ms. Hilario was an aggravated battery, I arrive at a different conclusion with respect to the sentence. I do so because I do not believe that this case fits into that "narrow class of the most heinous crimes" for which life without parole, the most severe penalty known in our state, is reserved. *See State v. Brown*, 898 A.2d 69, 86 (R.I.2006). It is true that defendant has not demonstrated significant remorse for the murder of Ms. Hilario.[39] It is equally true, however, that until the time of Ms. Hilario's murder, defendant had not been convicted of any crime. Much to the contrary, the record shows that he was a community leader who gave much of his time, effort, and emotion to others. Scores of letters sent to the trial justice attest to defendant's positive character traits and, in my opinion, provide strong evidence that he always was regarded as a caring man who had earned the respect of those with whom he came into contact.

At the time of his sentencing, the defendant was in his mid-fifties. If he had been sentenced to the mandatory term of life in prison, he would not even be eligible for parole until he had served a term of twenty years. Even then, he would be granted his freedom only after a unanimous vote of the parole board. *See* G.L.1956 § 13–8–13(a)(3)(i)–(ii). By that time, the defendant would be in his mid-seventies. I am confident that after that period of incarceration, the parole board would be more than sufficiently equipped to assess the defendant's conduct while imprisoned, any demonstrated remorse for his crime, and his ability to return to society as a peaceable person.

Accordingly, I respectfully dissent from that portion of the majority's opinion affirming the sentence of life without parole, and I would reduce the trial justice's sentence to life imprisonment.

---

**39.** As the majority notes, the presentence report indicated that, at least at the time of his post conviction interview, defendant was not only in denial about what he had done, but also had attempted to shift the blame for his crime to others, including to members of the Providence Police Department.